UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| Rebecca Taylor, Karl Hunter, and Heiwa Salovitz, *Plaintiffs*, <br><br> *v.* <br><br> The Housing Authority of New Haven, Karen DuBois–Walton, Jimmy Miller, David Alvarado, Ilona Leffingwell, Louise Persall, Robert Solomon, and Jason Turner, *Defendants*. | Civil No. 3:08cv557 (JBA) <br><br><br><br><br><br> March 29, 2010 |

MEMORANDUM OF DECISION

I.      Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2
II.     Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3
        A.      Plaintiffs' Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3
        B.      Class Certification. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4
        C.      Private Right of Action to Enforce 24 C.F.R. § 8.28(a). . . . . . .  6
III.    Legal Principles. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21
        A.      The Statutes. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21
        B.      Applicability of the FHA and FHAA to Plaintiffs' Claims. . .  23
        C.      Claims under the FHA. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  26
        D.      Claims under the FHAA and Section 504. . . . . . . . . . . . . . . . .  26
IV.     The Benefit Provided by the Section 8 Program. . . . . . . . . . . . . . . .  30
        A.      Principles. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  30
        B.      The Section 8 Program. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  34
        C.      HANH Policies Regarding Disabled Participants. . . . . . . . . .  43
V.      General Findings of Fact. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  44
VI.     Discussion and Conclusions of Law. . . . . . . . . . . . . . . . . . . . . . . . .  52
        A.      Decertification of the Class. . . . . . . . . . . . . . . . . . . . . . . . . . . .  52
        B.      Claim of Rebecca Taylor. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  63
        C.      Claim of Karl Hunter. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  71
        D.      Claim of Heiwa Salovitz. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  74
        E.      Summary. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  82
VII.    Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  83

I.     Introduction

Plaintiffs Rebecca Taylor, Karl Hunter, and Heiwa Salovitz claim that the Housing Authority of New Haven ("HANH")[1] discriminated against them and other disabled persons by failing to afford them certain accommodations to which they claim entitlement under the statutes and regulations governing HANH's implementation in New Haven of the Housing Choice Voucher Program (the "Section 8 Program" or "HCV Program") of the United States Department of Housing and Urban Development ("HUD").  They claim that HANH's discrimination took place during a liability period of 2006 through April 22, 2008, the date on which Taylor filed a motion for a preliminary injunction,[2] and they raise four claims related to HANH's actions during this period.

After full trial on the merits, and for the reasons that follow, the Court concludes that Plaintiffs have not shown Defendants' liability on any of the counts.  While Plaintiffs alleged that Defendants programmatically applied a policy that either intentionally discriminated against disabled HCV Program participants or failed to afford them reasonable accommodations, the evidence shows no discriminatory policy or programmatic approach to disabled participants' requests for reasonable accommodations.  Therefore, the Court must decertify the class that it earlier certified.  Plaintiffs also seek to enforce certain HUD

---

[1] Plaintiffs also bring suit against HANH Executive Director Karen DuBois–Walton, former HANH Executive Director Jimmy Miller, and five members of the Housing Authority Commission for the City of New Haven (David Alvarado, Ilona Leffingwell, Louise Persall, Robert Solomon, and Jason Turner).

[2] *See* Tr. 7/29/09 (Pre-Trial Conf.) at 13.

2

regulations, but they have no private right of action to enforce them. Finally, there is insufficient evidence that Defendants discriminated against the three named Plaintiffs, or that Defendants' conduct toward them deprived them of meaningful access to the benefits of the Section 8 Program.

II.     Claims

        A.  Plaintiffs' Claims

        In Count One, Plaintiffs allege that HANH violated the Fair Housing Act Amendments, 42 U.S.C. § 3604(f), by failing to provide them "mobility counseling" to assist them in searching for, finding, applying for, and moving into disabled-accessible housing, in some cases despite express requests for such assistance; failing to furnish them with a list of available accessible units (an "AAUL"), again in some cases despite express requests for such a list; and providing "grossly incompetent supervision of the staff responsible for responding to such requests." (3d Am. Compl. [Doc. # 140] at ¶¶ 64–69.)

        In Count Two, they allege that HANH violated Section 504 of the Rehabilitation Act ("Section 504"), 29 U.S.C. § 794(a), by "den[ying] the plaintiffs' requests for a reasonable accommodation through chaotic lack of adherence to their own procedures, repetitive and unnecessary procedural hurdles, unconscionable delays, or other acts of gross incompetence," despite the plaintiffs' need for such accommodations "in order to have equal access to the Section 8 [P]rogram." (*Id.* at ¶¶ 70–76.) At summation, counsel for Plaintiffs stated that this claim "has sort of meta[morpho]sized during the course of this litigation,"

and clarified that the claim was a "Rehabilitation Act claim that there was not a reasonable accommodation made." (Tr. Vol. IX (9/9/09) at 34.)

Count Three raises a claim, through 42 U.S.C. § 1983, that HANH has violated two relevant HUD regulations, 24 C.F.R. §§ 8.28(a) and 100.204, by instituting, condoning, knowing about, and failing to correct "policies, pattern and/or practices" that violate Plaintiffs' right to certain specific reasonable accommodations. (*Id.* at ¶¶ 77–83.)

Finally, in Count Four, Plaintiffs claim that HANH has violated Section 504 and 42 U.S.C. § 3604(d) and (f)(3) by failing to use "administrative fee[s]," which are provided by HUD under a Voluntary Compliance Agreement, to make its units accessible to persons with disabilities; by "refusing under any and all circumstances to use" these funds "to help permanently or temporarily modify privately owned units to make them accessible for rental by the plaintiffs"; by "failing to assist the plaintiffs in applying for other sources of funding for such modifications that are known to it"; and by "failing and/or refusing to include any information on applying for exception rents" or other sources of "additional amount of rent" for this purpose. (*Id.* at ¶¶ 84–92.)

    B.  Class Certification

Plaintiffs moved under Federal Rule of Civil Procedure 23 for class certification as to their first and third counts, and on March 10, 2009 the Court granted the certification motion. *See Taylor v. Hous. Auth. of New Haven*, 257 F.R.D. 23 (D. Conn. 2009) [Doc. # 108]. Without "holding 'a protracted mini-trial of substantial portions of the

underlying litigation,'" the Court concluded that the requirements of Rule 23 were met.  It

first held that the proposed class was ascertainable:

> Plaintiffs' claims relate to Defendants' alleged failure to provide two distinct
> items: an [AAUL] and mobility counseling. . . . Defining the class as those
> who were eligible for but did not receive either or both of these items
> provides objective criteria whose applicability to a given household can be
> determined in an administratively feasible manner and thus sets forth a
> sufficiently ascertainable class.

*Taylor*, 257 F.R.D. at 27, 29 (quoting *In re Initial Public Offering Sec. Litig.*, 471 F.3d 24, 41

(2d Cir. 2006) ("*In re IPO*")).  It next held that there was sufficient numerosity, because

Plaintiffs alleged that no acceptable AAUL existed, so HANH could not have provided such

a list to any of the "approximately 691" "households including at least one disabled member

to which HANH has issued a Housing Certificate or Housing Voucher ('Disabled Section

8 Household')," and also because "the putative class members are not financially incentivized

either to join this suit or institute their own individual suits."  *Id.* at 26, 29–30.  It rejected

Defendants' argument that there was no commonality or typicality of class members due to

the differences in disabilities, holding instead that "[w]hile the circumstances and nature of

each plaintiff's and class member's disability may differ, Plaintiffs allege that Defendants'

discriminatory policy or practice applies to them regardless of these differences, and that

Defendants' application of that policy or practice to them is unlawful for reasons unrelated

to each person's individual disability."  *Id.* at 30; *see also id.* at 31.  The Court certified the

class under Rule 23(b)(2) because Plaintiffs "allege[d] that [HANH's] policy, pattern and/or

practice is triggered by their status as Disabled Section 8 Households, regardless of their

particular disabilities, such that Defendants allegedly act on grounds generally applicable to

5

all named plaintiffs and putative class members." *Id.* at 32.  The Court certified the following class:

> All households including at least one handicapped person to which the Housing Authority of New Haven has issued a Housing Certificate or Housing Voucher, and:
>
> > (a) that did not receive a list of available, accessible apartments, as required under 42 U.S.C. § 3604(f), 24 C.F.R. § 100.204, and/or 24 C.F.R. § 8.28(a)(3); and/or
> >
> > (b) that did not receive Mobility Counseling services, or offer thereof, as required under 42 U.S.C. § 3604(f), 24 C.F.R. § 100.204, and/or 24 C.F.R. § 8.28(a)(3).

*Taylor*, 257 F.R.D. at 32–33.

> C.  Private Right of Action to Enforce 24 C.F.R. § 8.28(a)

Defendants argue that Plaintiffs do not have a private right of action to enforce the regulations found at 24 C.F.R. § 8.28(a), which Plaintiffs invoke in their third count.  The Court agrees.

Part 8 of Title 24 of the Code of Federal Regulations contains a set of regulations promulgated under Section 504.  *See* HUD, Section 8 Certificate and Voucher Programs Conforming Rule, 63 Fed. Reg. 23825, 23856 (Apr. 30, 1998) (Final Rule) ("Conforming Rulemaking") (Pl.'s Ex. 3).[3]  Plaintiffs invoke 24 C.F.R. § 8.28(a)(2), (3), and (5), and seek

---

[3] Plaintiffs argue that when it issued the Conforming Rulemaking in 1998, HUD re-issued part 8 under both Section 504 and the United States Housing Act of 1937, as amended, 42 U.S.C. § 1437 *et seq.*, and therefore part 8 is a "hybrid regulation."  This argument misreads the 1998 Rulemaking, which states that part 8 "implements [S]ection 504 of the Rehabilitation Act of 1973."  Conforming Rule, 63 Fed. Reg. at 23856; *see also id.* at 23849, 23851 (explaining that part 8 implements Section 504); *id.* at 23853 (noting that "[t]he citation authority for part 8 *continues to*" be Section 504 (emphasis added)); *see also* HUD, Nondiscrimination Based on Handicap in Federally Assisted Programs and Activities of the Department of Housing and Urban Development, 53 Fed. Reg. 20215, 20216 (June 2,

to enforce these subsections through 42 U.S.C. § 1983.  Defendants argue that there is no

private cause of action under § 1983 to enforce § 8.28(a).  For the reasons that follow, the

Court concludes that although the subsections of § 8.28(a) may provide guidance on whether

a proposed accommodation would be reasonable under Section 504 itself, Plaintiffs do not

have a private right of action to *enforce* § 8.28(a) through § 1983.[4]

---

1988) (promulgating 24 C.F.R. pt. 8 and noting that "[t]he rule implements [S]ection 504 of
the Rehabilitation Act of 1973, as amended."); 24 C.F.R. § 8.1(a) ("The purpose of this part
is to effectuate [S]ection 504 of the Rehabilitation Act of 1973.").  In fact, the Conforming
Rulemaking stated that in promulgating 24 C.F.R. § 982.517(e), HUD was "add[ing] a new
provision allowing the [housing authority] to establish a special higher utility allowance, on
a case-by-case basis, as a reasonable accommodation for a disabled person," and explained
that the idea was to assist housing authorities to provide "a reasonable accommodation in
accordance with 24 C.F.R. part 8 to make the program accessible to and usable by the family
member with a disability."  63 Fed. Reg. at 23846.

        It also bears noting that in its September 2006 investigative report of HANH, HUD
itself described part 8 as "the general regulatory provisions of Section 504."  (HUD
Investigation Report Review No. 01-06-R001-4, Jt. Ex. 3, at 9.)  *Cf. Auer v. Robbins*, 519 U.S.
452, 462 (1997) (giving deference to agency's interpretation of its own regulation where it
"is in no sense a '*post hoc* rationalizatio[n]' advanced by an agency seeking to defend past
agency action against attack" and "[t]here is simply no reason to suspect that the
interpretation does not reflect the agency's fair and considered judgment on the matter in
question").

        [4] Plaintiffs argue that a difference exists between assertion of authority to enforce
§ 8.28(a) through § 1983, and assertion of authority to enforce these regulations through
Section 504's implied right of action.  While Plaintiffs are correct that "the standards
diverge" in "the implied cause of action doctrine" and "under [a] § 1983 analysis," the
difference is immaterial here, since the *initial* inquiry—beyond which this Court need not
go in this case—is the same: "Under both tests, [a court] must initially decide if the statutory
language 'unambiguously confer[s] an enforceable right' upon an identifiable class of
beneficiaries."  *Taylor v. Vermont Dep't of Educ.*, 313 F.3d 768, 783 (2d Cir. 2002) (discussing
*Gonzaga* and *Sandoval*); *see also Gonzaga Univ. v. Doe*, 536 U.S. 273, 285 (2002) ("A court's
role in discerning whether personal rights exist in the § 1983 context should . . . not differ
from its role in discerning whether personal rights exist in the implied right of action
context."); *accord Save Our Valley v. Sound Transit*, 335 F.3d 932, 937 (9th Cir. 2003) ("The[]
statements [in *Sandoval*] refer to the creation of implied rights of action, rather than to the

Section 1983 "[i]s available to enforce violations of federal statutes by agents of the State" unless "the statute d[oes] not create enforceable rights, privileges, or immunities within the meaning of § 1983." *Wright v. City of Roanoke Redev. & Hous. Auth.*, 479 U.S. 418, 423 (1987) (explaining holdings of *Maine v. Thiboutot*, 448 U.S. 1 (1980) and *Pennhurst State School & Hosp. v. Halderman*, 451 U.S. 1 (1981)).  Thus, "[i]n order to seek redress through § 1983, . . . a plaintiff must assert the violation of a federal *right*, not merely a violation of federal *law*." *Blessing v. Freestone*, 520 U.S. 329, 340 (1997).  A court

> look[s] at three factors when determining whether a particular statutory provision gives rise to a federal right.  First, Congress must have intended that the provision in question benefit the plaintiff.  Second, the plaintiff must demonstrate that the right assertedly protected by the statute is not so 'vague and amorphous' that its enforcement would strain judicial competence.  Third, the statute must unambiguously impose a binding obligation on the States.  In other words, the provision giving rise to the asserted right must be couched in mandatory, rather than precatory, terms.

*Id.* at 340–41; *accord Loyal Tire & Auto Ctr., Inc. v. Town of Woodbury*, 445 F.3d 136, 149–50 (2d Cir. 2006).

In invoking § 8.28(a), however, Plaintiffs seek a private right of action not under a statute (i.e., Section 504), but under a regulation promulgated pursuant to that statute.  Neither the Supreme Court nor the Second Circuit has held that regulations can ever give rise to a private right of action distinct from the right of action conferred by the statute itself, and when confronted with the question whether federal *regulations*, as opposed to federal

---

creation of individual rights enforceable through § 1983.  But the Court's reasoning applies equally to both kinds of rights."); *Three Rivers Ctr. for Indep. Living, Inc. v. Hous. Auth. of the City of Pittsburgh*, 382 F.3d 412, 422 (3d Cir. 2004) (under *Gonzaga*, "Congress's creation of a personal right is necessary to the existence of both an implied right of action and a right of action under Section 1983").

*statutes*, may provide a private right, the Supreme Court cast some doubt on the proposition. In construing the private right of action to enforce a regulation under Title VI, 42 U.S.C. § 2000d *et seq.*, the Court held that "[l]anguage in a regulation may invoke a private right of action that Congress through statutory text created, but it may not create a right that Congress has not." *Alexander v. Sandoval*, 532 U.S. 275, 291 (2001);[5] *accord Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 173 (1994) (a "private plaintiff may not bring a 10b-5 suit against a defendant for acts not prohibited by the text of § 10(b)"); *see also Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 177–78 (2005) (recasting holding of *Central Bank of Denver* more generally to be that a "'private plaintiff may not bring a suit based on a regulation against a defendant for acts not prohibited by the text of the statute'" (alterations in *Jackson* omitted)).  Indeed, the Court has held that where regulations are valid and authoritatively construe a statute, it becomes "meaningless to talk about a cause of action to enforce the regulations apart from the statute." *Sandoval*, 532 U.S. at 284.  In *Sandoval*, the Court further explained that

> when a statute has provided a general authorization for private enforcement of regulations, it may perhaps be correct that the intent displayed in each regulation can determine whether or not it is privately enforceable. But it is most certainly incorrect to say that language in a regulation can conjure up

---

[5] In *Sandoval* the Supreme Court held that because Section 601 of Title VI (42 U.S.C. § 2000d)—which does provide for a private right of action—prohibits only *intentional* discrimination, and because Section 602 of that Title (§ 2000d-1) is directed at the agencies regulating the entities accepting federal funds rather than the entities themselves or the persons protected by Title VI, Department of Justice regulations promulgated under Sections 601 and 602 that prohibit *disparate impacts* cannot give rise to a private right of action under either section because the Section 601 private right of action is limited to actions for *intentional* discrimination, and because Section 602 does not provide a private right of action.

a private cause of action that has not been authorized by Congress.  Agencies may play the sorcerer's apprentice but not the sorcerer himself.

532 U.S. at 291.

Section 504, the statute under which HUD promulgated § 8.28(a), provides a federal right that is "enforceable through [a] private cause[] of action," *Barnes v. Gorman*, 536 U.S. 181, 184–85 (2002) (citing 29 U.S.C. § 794a(a)(2)), and Defendants do not contest that Plaintiffs have a cause of action to enforce *the statute*.  However, Plaintiffs do not (and could not) argue that the Rehabilitation Act, which contains an implied right of action, "provide[s] a general authorization for private enforcement of regulations," *Sandoval*, 532 U.S. at 291, so if Plaintiffs have any private right of action to enforce § 8.28(a), under *Sandoval* it cannot be any broader than the private right of action conferred on them by Section 504 itself.  Thus the question arises as to the scope of Section 504's implied private right of action, a question unaddressed by the parties aside from Defendants' reliance on one Third Circuit case that does not squarely address the question.

As 29 U.S.C. § 794a(a)(2) makes clear,[6] a private plaintiff's right of action to enforce Section 504 is derived from, and thus "coextensive with[,] the remedies available in a private cause of action brought under Title VI of the Civil Rights Act of 1964."  *Gorman*, 536 U.S. at 184–85 (citing 29 U.S.C. § 794a(a)(2)); *see also Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 590 n.4 (1999) ("Section 505 of the Rehabilitation Act incorporates the remedies, rights, and procedures set forth in Title VI of the Civil Rights Act of 1964 for violations of § 504 of

---

[6] This statute provides that "[t]he remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964 shall be available to any person aggrieved by any act or failure to act by any recipient of Federal assistance or Federal provider of such assistance under [Section 504]."  29 U.S.C. § 794a(a)(2).

the Rehabilitation Act. *See* 29 U.S.C. § 794a(a)(2)."); *accord Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 275 (2d Cir. 2009) ("A plaintiff aggrieved by a violation of the [Rehabilitation Act] may seek all remedies available under Title VI")*; Three Rivers Ctr. for Indep. Living, Inc. v. Hous. Auth. of the City of Pittsburgh*, 382 F.3d 412, 425 (3d Cir. 2004) (rights of action under the statutes are "contiguous").

Because Title VI—and thus, derivatively, Section 504—contains "an *implied* right of action," *Gorman*, 536 U.S. at 185 (citing *Cannon v. Univ. of Chicago*, 441 U.S. 677, 703 (1979)),[7] the right of action can extend no further than to where "the statutory language 'unambiguously confer[s] an enforceable right' upon an identifiable class of beneficiaries," *Taylor v. Vermont Dep't of Educ.*, 313 F.3d 768, 783 (2d Cir. 2002) (quoting and construing *Gonzaga Univ. v. Doe*, 536 U.S. 273, 283 (2002) (alteration in *Vermont Department of Education*)); *see also Three Rivers*, 382 F.3d at 424 (under *Sandoval*, when considering the enforceability of a regulation promulgated under a statute containing an implied right of action, "a court is really looking more precisely at whether the agency rule is within the scope of—i.e., construes, fleshes out, or fills in the interstices of—a personal right that the enabling statute creates"). And Section 504, which speaks expressly to a disabled person's right not

---

[7] While "Congress has since ratified *Cannon*'s holding," that ratification took the form of an "express[] abrogat[ion] [of] States' sovereign immunity against suits brought in federal court to enforce Title VI," *Sandoval*, 532 U.S. at 280 (citing 42 U.S.C. § 2000d-7), rather than the form of an express right of action, and is thus understood as "Congress [having] *acknowledged* this right," *Gorman*, 536 U.S. at 185 (emphasis added), rather than having *codified* it. The private rights of action to enforce Title VI, and thus Section 504, therefore remain "*implied* right[s] of action." *Id.* (emphasis in original); *accord Three Rivers*, 382 F.3d at 426 ("Section 504's private right of action derives—through Congress's use of parallel language, incorporation of Title VI's remedies in the 1978 amendments, and ratification of *Cannon*—from the right of action that exists to enforce Title VI." (describing holding of *Gorman*, 536 U.S. at 185)).

to "be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance," 29 U.S.C. § 794(a), provides to disabled persons the right to *access benefits* of a federally-funded program or activity. "The balance struck in [*Southeastern Community College v.*] *Davis*[, 442 U.S. 397 (1979) (interpreting Section 504)] requires that an otherwise qualified handicapped individual must be provided with *meaningful access to the benefit* that the grantee offers." *Alexander v. Choate*, 469 U.S. 287, 301 (1985) (emphasis added); *accord, e.g.*, *Powell v. Nat'l Bd. of Med. Examiners*, 364 F.3d 79, 85 (2d Cir. 2004) ("the Rehabilitation Act . . . prohibit[s] discrimination against qualified disabled individuals by requiring that they receive 'reasonable accommodations' that permit them to have access to and take a meaningful part in public services and public accommodations.").

The text of Section 504, like judicial construction of it, speaks broadly in terms of access to benefits. It does not, however, speak in terms of *specific components* of a benefit, program, or activity, or access to any specific components. *See Loeffler*, 582 F.3d at 276 (Section 504 "does not ensure equal medical treatment, but does require equal access to and equal participation in a patient's own treatment" (citing *Choate*, 469 U.S. at 301)); *Harris v. Mills*, 572 F.3d 66, 73 (2d Cir. 2009) (similar); *cf. Choate*, 469 U.S. at 299 (Section 504 embodies "two powerful but countervailing considerations—the need to give effect to the statutory objectives and the desire to keep § 504 within manageable bounds"). Therefore, the statute cannot be construed to unambiguously provide a private right of action to obtain any such specific or tangible components of the benefits of a program or activity. *Cf. Streck v. Bd. of Educ. of East Greenbush School Dist.*, 280 F. App'x 66, 68 (2d Cir. 2008) ("Under . . . the Rehabilitation Act, a demand for 'reasonable accommodations to assure access to an

12

existing program' is cognizable; but a demand for 'additional or different substantive benefits' is not." (quoting *Wright v. Giuliani*, 230 F.3d 543, 548 (2d Cir. 2000)).

Since the regulation cannot provide a right that the statute does not, it follows *a fortiori* that no *right* to specific, distinct, tangible, or concrete things purportedly granted to disabled persons by regulation can be said to fall within the scope of the private right provided by the statute itself, and therefore no such regulation-based right may be enforced through § 1983. *See Sandoval*, 532 U.S. at 291; *see also Three Rivers*, 382 F.3d at 429 (if "the regulations . . . construe non-personal rights or obligations that Section 504 creates . . . [or] create distinct rights or obligations—either personal or non-personal—in addition to those that Section 504 creates," then they are not privately enforceable); *South Camden Citizens in Action v. New Jersey Dep't of Envtl. Prot.*, 274 F.3d 771, 790 (3d Cir. 2001) (holding that under *Sandoval*, regulations do not create rights enforceable through a private right of action if the regulations, "though . . . valid, are not based on any federal right present in the statute."). Since 24 C.F.R. § 8.28(a) speaks to specific components of the Section 8 Program, it cannot be said to confer rights that come within the scope of the right conferred by Section 504 itself. In the language of *Sandoval*, 532 U.S. at 284, the prohibitions and obligations imposed by § 8.28(a) are *not* "covered by the cause of action to enforce" Section 504. Therefore, § 8.28(a)'s provisions are not enforceable under Section 504 or through § 1983.

Even taken on its own, 24 C.F.R. § 8.28(a) does not speak with the clarity necessary to conclude that it unambiguously confers any enforceable rights on Plaintiffs.[8] In *Gonzaga*

---

[8] Notwithstanding its having concluded that § 8.28(a) does not confer rights that fall within the right conferred by Section 504, the Court undertakes an analysis of the regulation's language given the lack of clarity in the case-law regarding whether, and when, a court must apply the *Gonzaga* analysis, which is applicable to *statutes*, to the text of a

the Supreme Court "reject[ed] the notion that [its] cases permit anything short of an unambiguously conferred right to support a cause of action brought under § 1983." *Gonzaga*, 536 U.S. at 283.  The Second Circuit made clear in *Vermont Department of Education* that under *Gonzaga* determination of whether "language 'unambiguously confer[s] an enforceable right' upon an identifiable class of beneficiaries" must turn on "the specific language" of the "provisions" on which the right of action is claimed to be based, *Vermont Dep't of Educ.*, 313 F.3d at 784, and also emphasized that to be enforceable through § 1983 the right purportedly found in "the specific language" must be "'*unambiguously* conferred,'" *id.* at 785 (quoting *Gonzaga*, 536 U.S. at 283 (emphasis in *Vermont Department of Education*)).  If a provision "combines elements of both . . . language that . . . does not

_____

regulation.  It may be that no such analysis is appropriate, since in *Sandoval* the Court reiterated that "[l]ike substantive federal law itself, private rights of action to enforce federal law must be created by Congress," 532 U.S. at 286, the *Gonzaga* analysis focuses on whether statutory text contain "the sort of 'rights-creating' language critical to showing the requisite *congressional intent* to create new rights," 536 U.S. at 287 (quoting *Sandoval*, 532 U.S. at 288–89), and the argument that "*regulations* [may] contain rights-creating language . . . skips [the] analytical step" of first determining whether "Congress through *statutory text* created" a private right of action, *Sandoval*, 532 U.S. at 291 (second emphasis added).

On the other hand, where Congress has, through statutory text, created a private right of action (in this case, an implied one), *Sandoval* can be read to suggest that an examination of the regulation's text might be appropriate to determine the scope of the purported regulation-created right so as to compare it with the statutory right, at least in circumstances where the right purportedly conferred by a regulation is less far afield from the statute than the relationship the Court confronted in *Sandoval* between the disparate-treatment statute, 42 U.S.C. § 2000d-1, and the disparate-impact regulation, 28 C.F.R. § 42.104(b)(2).  *See Sandoval*, 532 U.S. at 291; *see also Three Rivers*, 382 F.3d at 424 (reaffirming precedent "extend[ing] *Sandoval*'s reasoning to the Section 1983 context" in light of *Gonzaga*, and explaining that "a regulation cannot create a right enforceable through section 1983 where the alleged right does not appear explicitly in the statute, but only appears in the regulation.  A plaintiff can only enforce a regulation under Section 1983 if the regulation merely defines the specific right that Congress already has conferred through the statute" (internal quotations, citations, and alterations omitted)).

14

confer an individual right" and "individually focused language that evidences an intent to create a right," no right enforceable through § 1983 has been "unambiguously conferred," and therefore no § 1983 action lies. *See id.* at 785.

Turning to the regulations at issue, Plaintiffs seek to enforce three subsections of § 8.28(a), which provide:

> [A] recipient administering a Section 8 Existing Housing Certificate program or a housing voucher program shall: . . .
>
> (2) In its activities to encourage participation by owners, include encouragement of participation by owners having accessible units;
>
> (3) When issuing a Housing Certificate or Housing Voucher to a family which includes an individual with handicaps include a current listing of available accessible units known to the PHA and, if necessary, otherwise assist the family in locating an available accessible dwelling unit; . . . and
>
> (5) If necessary as a reasonable accommodation for a person with disabilities, approve a family request for an exception rent under § 982.504(b)(2) for a regular tenancy under the Section 8 certificate program so that the program is readily accessible to and usable by persons with disabilities.

24 C.F.R. § 8.28(a).

While HUD's use of the word "shall" in § 8.28(a), which is directed at public housing authorities ("PHAs"), is "mandatory"—rather than "precatory" or "hortatory," *see Pennhurst*, 451 U.S. at 24 (where statutory provision is "hortatory, not mandatory," no private right can be implied); *Blessing*, 520 U.S. at 340–41 ("the provision giving rise to the asserted right must be couched in mandatory, rather than precatory, terms")—examination of each subsection of § 8.28(a) reveals that at least two of the subsections are not enforceable through § 1983, and that, *a fortiori*, taken as a whole, § 8.28(a) cannot be read to "unambiguously confer[]" such a right. *See Vermont Dep't of Educ.*, 313 F.3d at 785.

15

First, subsection (2) of § 8.28(a) does not speak in terms of individuals' or beneficiaries' rights.  Instead, it addresses PHAs' obligation to encourage participation of owners who can offer units that are accessible to disabled persons.  Even assuming, *arguendo*, that PHAs' compliance with § 8.28(a)(2) would necessarily increase the availability of accessible housing in the private market, and, further, would thereby strengthen the ability of people with disabilities to find opportunities to use the benefit provided by PHAs, the subsection's language is directed at the relationship between PHAs and unit owners, and therefore does not evidence any intent to benefit Plaintiffs.  In addition, any individual's right under this subsection would be vague and amorphous because the regulation is devoid of an "objective benchmark," *see Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 519–20 (1990), by which the judiciary could measure PHAs' efforts and determine whether particular actions by the PHA are sufficiently "encourag[ing]" to satisfy the regulation.  Thus, subsection (2) cannot be read to create any private right, let alone one that is within the scope of the right enforceable under Section 504 itself.

Subsection (5) speaks in terms of necessity without providing any benchmarks for when the "reasonable accommodation" of an exception rent would be necessary.  Because the Supreme Court has implied a private right of action in Title VI, and because the Rehabilitation Act expressly invokes this implied right of action, the vagueness of the phrase "reasonable accommodation" cannot be understood to make the *statute* unenforceable.  However, subsection (5), standing on its own without the Rehabilitation Act's express invocation of another law's private right of action analogous to 29 U.S.C. § 794a(a)(2), is too vague and amorphous for the Court to conclude that this regulation includes an implied private right of action.  *See, e.g.*, *Suter v. Artist M.*, 503 U.S. 347, 363 (1992) (concluding that

a statute requiring a State to make "reasonable efforts" "does not unambiguously confer an enforceable right upon the Act's beneficiaries" because the language "is at least as plausibly read to impose only a rather generalized duty on the State, to be enforced not by private individuals, but by the Secretary" pursuant to an administrative-enforcement scheme); *Gonzaga*, 536 U.S. at 281–83 (summarizing holdings in *Suter* and *Blessing* that rejected efforts to read implied private rights of action into statutes, and forcefully rejecting argument that the Court's cases "establish a relatively loose standard for finding rights enforceable by § 1983"); *cf. id.* at 295 (Stevens, J., dissenting) (explaining that majority was rejecting a proposed right that "is more specific and clear than rights previously found enforceable under § 1983 in [*Wright*] and [*Wilder*], both of which involved plaintiffs' entitlement to 'reasonable' amounts of money").[9]

In addition, the first part of Subsection (3) contains language that could be read to give rise to a private right, but that right—to an accessible unit list, which is a particular document containing particular information, upon receipt of a housing voucher—is too specific and is directed at a particular object (i.e., a document listing certain apartments), and therefore falls outside the scope of the general right to meaningful access provided by Section 504.  Assuming, *arguendo*, that this language creates a private right, it is a right to a concrete and tangible object—an AAUL.  But Section 504 does not create rights to any specific components of any program or activity and cannot be construed to unambiguously provide a private right of action to obtain any such specific or tangible components.  *See, e.g.*, *Streck*, 280 F. App'x at 68 ("a demand for 'additional or different substantive benefits' is not"

---

[9] It is also worth noting that Subsection (5) references another regulation, § 982.504(b)(2), that does not exist.

cognizable under Section 504).  Therefore, the private right to an accessible unit list, which *arguendo* arises under § 8.28(a)(3), is a right that extends beyond the enforceable right unambiguously conferred by the statutory language, and thus cannot be privately enforced. *See Vermont Dep't of Educ.*, 313 F.3d at 783.

Even if § 8.28(a)(3) and (5) could be construed to contain "individually focused language that evidences an intent to create an enforceable right," those provisions are surrounded by language that "does not confer an individual right," so, like the court in *Vermont Department of Education*, 313 F.3d at 785, this Court "cannot say that [§ 8.28(a)] creates . . . '*unambiguously* conferred right[s]."  Bolstering the Court's conclusion that § 8.28(a)(2), (3) and (5) are not enforceable directly through § 1983 is HUD's description of the purpose of 24 C.F.R. part 8 and the fact that its regulations provide an administrative-enforcement scheme.  HUD explains that

> The policies and standards for compliance established by this part are established in contemplation of, and with a view to enforcement through, the Department's administration of programs or activities receiving Federal financial assistance and the administrative procedures described in Subparts D and E (including, without limitation, judicial enforcement under § 8.57(a)).

24 C.F.R. § 8.1(b).  In turn, the compliance provisions in Subpart D of part 8 ("Enforcement") specify the contemplated enforcement scheme, which is primarily administrative.  First, the regulation entitled "Compliance information" specifies, in pertinent part: "Cooperation and assistance. The responsible civil rights official and the award official shall, to the fullest extent practicable, seek the cooperation of recipients in obtaining compliance with this part and shall provide assistance and guidance to recipients

to help them comply voluntarily with this part." *Id.* § 8.55(a).[10]  Second, the regulation

entitled "Procedure for effectuating compliance" provides:

> (a) General. If there appears to be a failure or threatened failure to comply
> with this part and if the noncompliance or threatened noncompliance
> cannot be corrected by informal means, compliance with this part may
> be effected by the suspension or termination of or refusal to grant or to
> continue Federal financial assistance, or by other means authorized by
> law. Such other means may include, but are not limited to:
>
> (1) A referral to the Department of Justice with a recommendation that
> appropriate proceedings be brought to enforce any rights of the
> United States under any law of the United States, or any assurance or
> other contractual undertaking;
>
> (2) The initiation of debarment proceedings pursuant to 2 [C.F.R.] part
> 2424; and
>
> (3) Any applicable proceeding under State or local law.

*Id.* § 8.57(a).  The regulations thus clearly contemplate an enforcement scheme in which a

public housing authority's compliance with the regulations is to be enforced administratively

by HUD, first, through "informal means," and second, by discontinuing, or threatening to

discontinue, federal funding.  Where these administrative mechanisms do not achieve

compliance, the regulations contemplate both judicial and administrative proceedings,[11] but

the only entity which the regulation contemplates will bring an action *under federal law* is

the Department of Justice, which is the only entity described in the regulations as having any

---

[10] Other regulations make clear that the "responsible civil rights official" designates
a set of HUD employees in Washington, DC who oversee PHAs and administrative
complaints brought against them.  *See* 24 C.F.R. § 8.56 ("Conduct of investigations").

[11] 2 C.F.R. part 2424 concerns "Nonprocurement Debarment and Suspension" and
prescribes the procedures to be followed when HUD seeks to stop funding a project.  *See* 2
C.F.R. § 2424.220 ("this part applies to any contract . . . if the contract is to be funded or
provided by HUD under a covered nonprocurement transaction and the amount of the
contract is expected to equal or exceed $25,000").

"rights."   To the extent that § 8.57(a) could be construed as contemplating private enforcement by court action, such enforcement would be accomplished through "State or local law"—but not federal law or the regulations themselves.

While this administrative-enforcement scheme does not clearly foreclose the possibility that some of the regulations in 24 C.F.R. part 8 may be enforceable through § 1983, it further counsels in favor of the Court's conclusion that § 8.28(a)(2), (3), and (5) are not so enforceable.   Indeed, even if an administrative-enforcement scheme is not so comprehensive as to "*preclude* a finding of . . . intent to create a private right of action," it may "tend to contradict a[n] . . . intent to create privately enforceable rights." *Sandoval*, 532 U.S. at 290–91 (emphasis added).   Indeed, the availability of "administrative procedures" to enforce regulations "further counsel[s] against [a court's] finding a congressional intent to create individually enforceable private rights." *Gonzaga*, 536 U.S. at 289–90.

For all these reasons, the Court concludes that Plaintiffs may not enforce any part of 24 C.F.R. § 8.28(a) through 42 U.S.C. § 1983.   Nonetheless, Defendants do not challenge the *validity* of § 8.28(a), and regulations may be valid even if they do not create provide rights enforceable through § 1983. *See Three Rivers*, 382 F.3d at 429 n.18 ("Nothing here is meant to cast doubt on the validity of the HUD regulations themselves. But the validity of the regulations is a different question than whether they are privately enforceable.").   Consistent with the parties' positions, the Court will assume that § 8.28(a) is valid and applicable to HANH, *see Taylor*, 257 F.R.D. at 26 n.2 ("Defendants admit that as the administrator of the Section 8 Program for this area, HANH is subject to the regulations under which Plaintiffs

bring this suit."),[12] and therefore will construe them probatively, as providing interpretive meaning as to whether particular kinds of accommodations by a PHA such as HANH are reasonable.  *See, e.g., Telesca v. Long Island Hous. Partnership, Inc.*, 443 F. Supp. 2d 397, 410 (E.D.N.Y. 2006) ("The Court notes that any of the HUD regulations implementing the Rehabilitation Act may be relevant in determining whether the defendants are liable under Section 504, and what remedies are available to address such violation."); *see also Henrietta D. v. Bloomberg*, 331 F.3d 261, 280 (2d Cir. 2003) ("We do not intimate that either the mere fact that [a city ordinance] was enacted or the fact that it was viewed as 'access' legislation *per se* makes it a reasonable accommodation under the relevant federal statutes.  We find it to be a *prima facie* reasonable accommodation because we agree with the District Court that its provisions are consistent with its goal of serving as a reasonable accommodation, and it does not appear to impose costs that obviously outweigh its benefits.").

Now that the Court has concluded that Plaintiffs cannot enforce § 8.28(a), and because they bring another claim under Section 504 itself—under which HUD promulgated § 8.28(a)—Plaintiffs' third count is coterminous with the second count, which invokes Section 504 itself.

III.    Legal Principles

A.  The Statutes

The Fair Housing Amendments Act of 1988, Pub. L. 100-430, § 6(b), 102 Stat. 1619, 1622, amended the Fair Housing Act to prohibit discrimination on the basis of "handicap"

---

[12] *See also* HANH Reply to HUD Section 504 Investigative Report, Jt. Ex. 4, at 2 ("In accordance with 24 CFR 8.28, HANH is obligated to provide specific assistance to Section 8 families that include persons with disabilities.").

or disability[13] in advertising for or showing a "dwelling" for sale or lease.  *See* 42 U.S.C. § 3604(c)–(e).  Section 6(a) of the 1988 act amended the Fair Housing Act to prohibit discrimination on the basis of a "handicap" of a buyer/renter or anyone associated with or planning to live in the "dwelling," in offering for sale or lease, or in crafting and construing the terms of sale or lease, of any "dwelling, or in the provision of services or facilities in connection with such dwelling."  *See* 42 U.S.C. § 3604(f).

Plaintiffs bring suit under § 3604(d) (the "FHA") and § 3604(f)(3) (the "FHAA"). In relevant part, § 3604(d) provides: "[I]t shall be unlawful . . . [t]o represent to any person because of . . . handicap . . . that any dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available."  § 3604(f), a longer provision, states in relevant part:

> [I]t shall be unlawful . . .
>
> (f) (1) To discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of— ["that buyer or renter," anyone "associated with that person," or anyone who is or will be the tenant or the subject dwelling; and]
>
> (2) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap of— ["that person," anyone "associated with that person," or anyone who is or will be the tenant or the subject dwelling].
>
> (3) For purposes of this subsection, discrimination includes—

---

[13] The term "handicap" as used in the FHA has the same legal meaning as the now more generally accepted term "disability."  *Bragdon v. Abbott*, 524 U.S. 624, 631 (1998); *see also Taylor*, 257 F.R.D. at 26 n.4.  The Court will use the latter except when quoting the statute.

> (A)   a refusal to permit, at the expense of the handicapped person, reasonable modifications of existing premises occupied or to be occupied by such person if such modifications may be necessary to afford such person full enjoyment of the premises . . .
>
> (B)   a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling; or
>
> (C)   in connection with the design and construction of covered multifamily dwellings for first occupancy after [March 13, 1991 that does not provide accessibility for disabled persons].

42 U.S.C. § 3604(f).

Plaintiffs also bring suit under Section 504, which, as described above, provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service." 29 U.S.C. § 794(a).

B.      Applicability of the FHA and FHAA to Plaintiffs' Claims

It is not entirely clear whether the FHA and FHAA apply to HANH's administration of the Section 8 Program. Section 8 participants are tenants in privately-owned dwellings rather than dwellings owned by the federal government, state government, local municipality, or HANH, so HANH is not acting in the capacity of a "landlord," "owner," or "seller" when it administers the program. It appears that no court has addressed the question of whether the Fair Housing Act or its Amendments apply to the conduct of a public housing authority acting *not* as a dwelling owner (i.e., in the context of low income public housing), but instead as a provider of funds for use in renting privately-owned

dwellings (i.e., in the context of administering a Section 8 Program). Some courts have addressed the merits of such claims, but in contexts where the issue of the statutes' applicability has not been raised. *See, e.g.*, *Sierotowicz v. New York City Hous. Auth.*, 214 F. App'x 101, 102–03 (2d. Cir. 2007) (reversing, on other grounds, dismissal of Section 8 participants' suit under 42 U.S.C. § 3604(f) against housing authority); *Burgess v. Alameda Hous. Auth.*, 98 F. App'x 603, 605–06 (9th Cir. 2004) (same).

Nevertheless, Court will assume the applicability of the FHA and the FHAA for two reasons. First, no party has disputed the statutes' applicability. Second, the Act states an extremely broad governmental policy—"to provide, within constitutional limitations, for fair housing throughout the United States," 42 U.S.C. § 3601—that would be furthered by preventing public housing authorities administering Section 8 voucher programs from discriminating on the basis of disability. Indeed, "[t]he Supreme Court has repeatedly directed the courts to give a 'generous construction' to the Fair Housing Act." *Hack v. President and Fellows of Yale Coll.*, 237 F.3d 81, 87 (2d Cir. 2000) (opinion of Moran, J.) (quoting, *inter alia*, *Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 211–12 (1972)), *abrogated on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002); *see also Thompson v. U.S. Dep't of Hous. and Urban Dev.*, 348 F. Supp. 2d 398, 415–16 (D. Md. 2005) ("At least with respect to government defendants, the case law indicates that there can be a constructive illegal 'denial' of housing—i.e., a government entity may violate § 3604(a) by denying a plaintiff a housing opportunity (as opposed to an actual brick-and-mortar dwelling). . . . Indeed, in an era where housing authorities are transitioning from the provision of 'hard units' to the administration of more intangible housing programs involving vouchers etc., a broad reading of § 3604(a) is appropriate to continue to hold

24

government entities accountable under the subsection."). And courts, including the Second Circuit, have applied the Act to towns and zoning boards that similarly do not act in the capacity of owners, landlords, or sellers. *See Tsombanidis v. West Haven Fire Dep't*, 352 F.3d 565, 573 (2d Cir. 2003) (noting, in the context of a challenge to a municipal zoning decision, that "the FHAA . . . prohibit[s] governmental entities from implementing or enforcing housing policies in a discriminatory manner against persons with disabilities"); *see also, e.g.*, *Reg'l Econ. Cmty. v. City of Middletown*, 294 F.3d 35 (2d Cir. 2002); *Lapid–Laurel, L.L.C. v. Zoning Bd. of Adjustment*, 284 F.3d 442 (3d Cir. 2002).

The Court remains cognizant that there is authority suggesting that § 3604 applies only to landlords, owners, and others who offer dwellings for rent or sale, and therefore that the statute would be inapplicable to a PHA administering a Section 8 voucher program, since in that capacity the PHA does not own or otherwise offer a dwelling for rent or sale to a Section 8 participant. *See Growth Horizons, Inc. v. Delaware County, Pa.*, 983 F.2d 1277, 1283 (3d Cir. 1993) ("As its text and legislative history evidence, the purpose of [§ 3604(f)] is to protect the housing choices of handicapped individuals who seek to buy or lease housing and of those who seek to buy or lease housing on their behalf. The conduct and decision-making that Congress sought to affect was that of persons in a position to frustrate such choices—*primarily, at least, those who own the property of choice and their representatives.*" (emphasis added)); *see also Hack*, 237 F.3d at 88 (opinion of Pooler, J.) (rejecting claim of religious discrimination under the FHA because "the FHA does not require a *landlord or seller* to provide a reasonable accommodation with respect to an individual applicant's religion" (emphasis added)).

C.    Claims under the FHA

"The framework of burdens fashioned in Title VII cases is fully applicable to [FHA] housing discrimination cases." *Cabrera v. Jakabovitz*, 24 F.3d 372, 383 (2d Cir. 1994); *see also id.* 381–82 (describing "the three-step formulation of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248 (1981)" in the context of fashioning jury instructions). To establish a *prima facie* case under this familiar framework, a plaintiff must show that "(1) the plaintiff is a member of the class protected by the statute, (2) the plaintiff sought and was qualified for an apartment . . ., (3) the plaintiff was denied the opportunity to rent the apartment . . ., and (4) the apartment . . . remained available thereafter." *Id.* at 381 (references to discrimination in *employment* omitted). After a plaintiff has made out a *prima facie* case, the burden shifts to the defendant "to produc[e] evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason. This burden is one of production, not persuasion; it can involve no credibility assessment." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (internal quotations omitted). At the third stage of the *McDonnell Douglas* test, "the sole remaining issue [is] 'discrimination *vel non*,'" *Byrnie v. Town of Cromwell*, 243 F.3d 93, 101–02 (2d Cir. 2001) (citations omitted), and "the governing standard is simply whether the evidence, taken as a whole, is sufficient to support a reasonable inference that prohibited [retaliation] occurred," *James v. New York Racing Ass'n*, 233 F.3d 149, 156 (2d Cir. 2000); *see also Reeves*, 530 U.S. at 150.

D.    Claims under the FHAA and Section 504

"To establish discrimination under . . . the FHAA . . . plaintiffs have three available theories: (1) intentional discrimination (disparate treatment); (2) disparate impact; and

(3) failure to make a reasonable accommodation." *Tsombanidis*, 352 F.3d at 573.  Plaintiffs

assert the first and third theories.  The third theory, and the case-law governing it, also

applies to Section 504.

### 1.    *Intentional Discrimination*

Under the intentional discrimination theory applicable to the FHAA, Plaintiffs must

first show that their status as disabled persons was "a motivating factor behind the"

Defendants' actions. *Tsombanidis*, 352 F.3d at 579.  "Factors to be considered in evaluating

a claim of intentional discrimination include: (1) the discriminatory impact of the

governmental decision; (2) the decision's historical background; (3) the specific sequence

of events leading up to the challenged decision; (4) departures from the normal procedural

sequences; and (5) departures from normal substantive criteria." *Id.* at 580.  Thereafter, the

court analyzes a claim under this theory pursuant to the *McDonnell Douglas* test described

above.  *Reg'l Econ. Cmty.*, 294 F.3d at 48–49.

### 2.    *Reasonable Accommodation*

The reasonable accommodation theory of liability applies to both the FHAA and

Section 504.[14]   Even before a plaintiff can bring suit for denial of a reasonable

accommodation, she must request the accommodation she seeks directly from the

governmental entity she sues:

> To prevail on a reasonable accommodation claim, plaintiffs must first
> provide the governmental entity an opportunity to accommodate them
> through the entity's established procedures used to adjust the neutral policy
> in question[, because] [a] governmental entity must know what a plaintiff
> seeks prior to incurring liability for failing to affirmatively grant a reasonable
> accommodation.  It may be that once the governmental entity denies such an

---

[14] *See infra* note 14.

> accommodation, neither the FHAA nor [Section 504] require a plaintiff *to exhaust* the state or local administrative procedures. But a plaintiff must first use the procedures available to notify the governmental entity that it seeks an exception or variance from the facially neutral laws when pursuing a reasonable accommodation claim.

*Tsombanidis*, 352 F.3d at 579 (internal quotations omitted).[15]  A plaintiff must then make

out a *prima facie* claim:

> To make out a claim of discrimination based on failure to reasonably accommodate, a plaintiff must demonstrate that: (1) he suffers from a handicap . . .; (2) defendants knew or reasonably should have known of the plaintiff's handicap; (3) accommodation of the handicap 'may be necessary' to afford plaintiff an equal opportunity to use and enjoy the dwelling; and (4) defendants refused to make such accommodation."

*Bentley v. Peace and Quiet Realty 2 LLC*, 367 F. Supp. 2d 341, 344 (E.D.N.Y. 2005) (citations

omitted).

A person is "otherwise qualified" for purposes of Section 504 if she "is able to meet

all of the programs' requirements in spite of [her] handicap." *Doe v. Pfrommer*, 148 F.3d 73,

82 (2d Cir. 1998) (citing *Davis*, 442 U.S. at 406).  As the Supreme Court has construed it,

Section 504 "requires that an otherwise qualified handicapped individual must be provided

with meaningful access to the benefit that the grantee offers," and the "benefit" must not "be

---

[15] *Tsombanidis* addressed § 3604(f) and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131(2). However, its holding is fully applicable to Section 504 as well. Indeed, *Tsombanidis* relies on *Shapiro v. Cadman Towers, Inc.*, 51 F.3d 328 (2d Cir. 1995), which held that "in enacting [§ 3604(f)], Congress relied on the standard of reasonable accommodation developed under section 504 of the Rehabilitation Act of 1973, codified at 29 U.S.C. § 794," observed that "[t]he legislative history of section 42 U.S.C. § 3604(f) plainly indicates that its drafters intended to draw on case law developed under section 504," and applied Section 504 case-law to interpret § 3604(f).  *Shapiro*, 51 F.3d at 333–35; *see Tsombanidis*, 352 F.3d at 578 (citing *Shapiro*, 51 F.3d at 333–35).  Therefore, the discussion in *Tsombanidis* regarding reasonable accommodations applies to Plaintiffs' claims under § 3604(f) and Section 504.

defined in a way that effectively denies otherwise qualified handicapped individuals the meaningful access to which they are entitled." *Choate*, 469 U.S. at 301. "[T]o assure meaningful access, reasonable accommodations in the grantee's program or benefit may have to be made," *id.*, but courts should be mindful that the statute prohibits "illegal discrimination against the disabled," but not "the substance of the services provided to" them, *Doe*, 148 F.3d at 84.

"On the issue of reasonable accommodation, the plaintiff bears only the burden of identifying an accommodation, the costs of which, facially, do not clearly exceed its benefits." *Borkowski v. Valley Cent. School Dist.*, 63 F.3d 131, 139 (2d Cir. 1995) (discussing "reasonable accommodation" in the context of a Section 504 claim for employment discrimination); *accord Henrietta D.*, 331 F.3d at 280 (applying *Borkowski* burdens to claim under Section 504 by disabled persons for reasonable accommodations in provision of city-administered benefits programs). Indeed, "[i]t is enough for the plaintiff to suggest the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits. Once the plaintiff has done this, she has made out a *prima facie* showing that a reasonable accommodation is available." *Borkowski*, 63 F.3d at 138. The Second Circuit has held that the FHAA and Section 504

> require that changes be made to such traditional rules or practices if necessary to permit a person with handicaps an equal opportunity to use and enjoy a dwelling. Plaintiffs must show that, but for the accommodation, they likely will be denied an equal opportunity to enjoy the housing of their choice. A defendant must incur reasonable costs and take modest, affirmative steps to accommodate the handicapped as long as the accommodations sought do not pose an undue hardship or a substantial burden.

*Tsombanidis*, 352 F.3d at 579 (internal quotations omitted).

After a plaintiff "has made out a *prima facie* showing that a reasonable accommodation is available, . . . the risk of nonpersuasion falls on the defendant." *Borkowski*, 63 F.3d at 138.  A defendant need not, "in attempting to meet [its] burden of persuasion on the reasonableness of the proposed accommodation and in making out an affirmative defense of undue hardship, . . . analyze the costs and benefits of proposed accommodations with mathematical precision. . . . [A] common-sense balancing of the costs and benefits in light of the factors listed in the regulations is all that is expected." *Id.* at 140.

As this standard suggests, "[w]hether a requested accommodation is required . . . is highly fact-specific, requiring case-by-case determination.  Ordinarily, the duty to make reasonable accommodations is framed by the nature of the particular handicap." *Bentley*, 367 F. Supp. 2d at 344 (internal quotations omitted).  This is because "'[r]easonable is a relational term: it evaluates the desirability of a particular accommodation according to the consequences that the accommodation will produce.  This requires an inquiry not only into the benefits of the accommodation but into its costs as well. . . .  In short, an accommodation is reasonable only if its costs are not clearly disproportionate to the benefits that it will produce." *Borkowski*, 63 F.3d at 138.

IV.    The Benefit Provided by the Section 8 Program

A.    Principles

The Rehabilitation Act prohibits the exclusion of disabled people from "the benefits of . . . any program or activity," 29 U.S.C. § 794(a), states that "the term 'program or activity' means all of the operations of" HANH, *id.* § 794(b)(1)(B), and leaves the task of defining the relevant "benefit" to the courts, *see Choate*, 469 U.S. at 301.  Thus, in order to consider

Plaintiffs' Section 504 claim, the Court must first define the "benefit that [HANH] offers"

through the Section 8 Program.

The critical issue in defining a "benefit" when considering a Section 504 claim is the

level of abstraction at which to answer the question.  In *Choate* disabled Medicaid recipients

in Tennessee claimed that that state violated Section 504 when it reduced from 20 to 14 the

number of inpatient treatment days covered by its Medicaid program because disabled

Medicaid recipients needed longer inpatient care than non-disabled recipients, and therefore

the reduction had a disparate impact.  469 U.S. at 289–91.  The Supreme Court rejected this

claim, holding that

> The new limitation does not invoke criteria that have a particular
> exclusionary effect on the handicapped; the reduction, neutral on its face,
> does not distinguish between those whose coverage will be reduced and those
> whose coverage will not on the basis of any test, judgment, or trait that the
> handicapped as a class are less capable of meeting or less likely of having. . . .
>
> To the extent respondents . . . suggest that their greater need for prolonged
> inpatient care means that, to provide meaningful access to Medicaid services,
> Tennessee must single out the handicapped for more than 14 days of
> coverage, the suggestion is simply unsound.  At base, such a suggestion must
> rest on the notion that the benefit provided through state Medicaid programs
> is the amorphous objective of "adequate health care."   But Medicaid
> programs do not guarantee that each recipient will receive that level of health
> care precisely tailored to his or her particular needs.  Instead, the benefit
> provided through Medicaid is a particular package of health care services,
> such as 14 days of inpatient coverage.  That package of services has the
> general aim of assuring that individuals will receive necessary medical care,
> but the benefit provided remains the individual services offered—not
> "adequate health care."

*Id.* at 302–03.  The Supreme Court went on to explain that the Medicaid Act "makes . . .

clear" that the benefit Medicaid provides is "a particular package of health care services"

rather than "the amorphous objective of 'adequate health care.'"  *See id.* at 303.  The Court

further held that defining a benefit with specificity also accorded with the purpose of the Rehabilitation Act, since "Section 504 does not require the State to alter this definition of the benefit being offered simply to meet the reality that the handicapped have greater medical needs" and "does not . . . guarantee the handicapped equal results from the provision of state Medicaid, even assuming some measure of equality of health could be constructed." *Id.* at 303–04.

Following the Supreme Court's lead in *Choate*, the Second Circuit has declined to define benefits abstractly or broadly. Instead, a benefit should be defined as specifically as possible, keeping in mind that Section 504 prohibits discrimination but does not mandate the provision of new benefits. Specifically, the Second Circuit has warned against construing a "benefit" in a Section 504 case at an "incorrect level of generality." *See Rodriguez v. City of New York*, 197 F.3d 611, 617 (2d Cir. 1999). In *Rodriguez*, mentally disabled Medicaid recipients charged the City of New York with discriminating on the basis of mental disability by "fail[ing] to include safety monitoring" as part of a constellation of "personal-care services" provided by the City pursuant to New York's Medicaid plan. *Id.* at 613–14. They argued "that, because safety monitoring is 'comparable' to the personal care services already provided by New York" to physically disabled people, the City violated both the Medicaid law and Section 504[16] by failing to provide the mentally disabled with safety monitoring, a service they need and that is "comparable" to a service the City does provide. *Id.* at 614–16.

_____

[16] The *Rodriguez* plaintiffs brought claims under both Section 504 and the ADA. *Rodriguez*, 197 F.3d at 613. The court held that "[b]ecause Section 504 . . . and the ADA impose identical requirements," it would "consider these claims in tandem." *Id.* at 618. For simplicity and relevance, this Court refers to the claims under Section 504 and the ADA in *Rodriguez* as simply a claim under Section 504.

The court first rejected the argument that the non-provision of safety monitoring violated the Medicaid laws, holding that "[a] clear and legitimate distinction exists . . . between providing safety monitoring *as an incidental benefit* when the [personal-]care-giver is assisting with another task," on the one hand, and "providing [safety monitoring] as an *independent task*, when the caregiver is present *only* to monitor the patient's safety." *Id.* at 616 (emphases added).  The court then rejected the Section 504 claim.  It rejected the plaintiffs' argument that "the purpose of the personal care services is to enable recipients to reside in their homes," and that they were denied meaningful access to that benefit because they need safety monitoring to remain in their homes, *id.* at 617, holding that that argument "fail[ed] to focus on the particular services provided by" the City and framed in too amorphous and broad a fashion the "benefit" at issue, *id.* at 618.  The court concluded:

> [Section 504] requires only that a particular service provided to some not be denied to disabled people. . . . [T]he services that New York provides to the mentally disabled are no different from those provided to the physically disabled.  Neither group is provided with independently tasked safety monitoring.  Hence, what appellees are challenging "is not illegal discrimination against the disabled, but the substance of the services provided."  Thus, New York cannot have unlawfully discriminated against appellees by denying a benefit that it provides to no one.

*Id.* at 618 (quoting *Doe*, 148 F.3d at 83, 84).

More generally, the Second Circuit has explained that "the central purpose of [Section 504] is to assure that disabled individuals receive 'evenhanded treatment' in relation to the able-bodied," and has suggested that in light of its specific prohibition—it "mandate[s] *only* that the services provided . . . to non-handicapped individuals not be denied to a disabled person *because* he is handicapped"—the relevant inquiry in a Section 504 case is of the benefits provided to disabled people "as compared to the benefits given to non-[disabled]

individuals." *See Doe*, 148 F.3d at 83.  As another circuit has recently framed it, Section 504 does not provide a right of action to bring "a challenge to the scope of a non-discriminatory program." *Am. Council of the Blind v. Paulson*, 525 F.3d 1256, 1268 (D.C. Cir. 2008).

Following *Choate*, *Doe*, and *Rodriguez*, the Court will determine the "benefits" of the Section 8 Program primarily by reference to the laws and regulations that control HANH's administration of the program: the United States Housing Act of 1937, as amended, 42 U.S.C. § 1437 *et seq.* (the "1937 Act") and HUD's implementing regulations.  The Court is mindful that another court has construed the benefit provided by Section 8 in the context of a Rehabilitation Act challenge premised on the inability of "mobility disabled people . . . to locate and obtain accessible housing units."  That court held:

> The benefits of the [Section 8] Program are a package of services that provide assistance to voucher holders in locating affordable housing.  These benefits include: inspection of premises for compliance with quality standards, training for landlords, a service representative who may be contacted for questions, weekly landlord briefings to educate landlords interested in participating in [Section 8], a list of known available units, monthly housing fairs, and various other services.

> [Section 8] does not offer participants a place to live as a benefit.  [Section 8] is not responsible for locating participant housing.  Rather, the onus is on program participants to find their own rental units.

*Liberty Res., Inc. v. Phila. Hous. Auth.*, 528 F. Supp. 2d 553, 568, 568 (E.D. Pa. 2007).

B.     The Section 8 Program

HUD administers the Section 8 Program under the authority of the 1937 Act.  The first subsection of the Section 8 portion of the 1937 Act, 42 U.S.C. § 1437f, describes the purpose of the Section 8 Program.  It provides: "For the purpose of aiding low-income families in obtaining a decent place to live and of promoting economically mixed housing,

34

*assistance payments may be made with respect to existing housing* in accordance with the provisions of this section."  42 U.S.C. § 1437f(a) (emphasis added).  Under the Section 8 Program, in which Plaintiffs participated,[17] HUD "may provide assistance to public housing agencies for tenant-based assistance using a payment standard established in accordance with [the statute].  The payment standard shall be used to determine the monthly assistance that may be paid for any family."  *Id.* § 1437f(o)(1)(A).  There are two forms of assistance available under the voucher program: tenant-based and project-based assistance.

> 1.      Tenant-Based Assistance

Under the tenant-assistance portion of the voucher program, the PHA enters into "housing assistance payment contract[s]" with private landlords,[18] and the Section 8 participant enters into a lease with the owner under that contract.  Thus, in the statute's terminology, the PHA–landlord document is a "contract," and the tenant–landlord document is a "lease."  *See generally id.* § 1437f(o)(6), (7).

The Act imposes certain requirements on PHA–landlord contracts.  They must specify that except in certain circumstances, the tenant–landlord lease "shall be for a term of *not less than 1 year*," *id.* § 1437f(o)(7)(A) (emphasis added),[19] and that the tenant–owner

---

[17] In 1998 Congress merged the then-existing Section 8 *certificate* and *voucher* programs, *see generally Comer v. Cisneros*, 37 F.3d 775, 782 (2d Cir. 1994) (describing these programs), into a single program, the Housing Choice Voucher Program, *see* Quality Housing and Work Responsibility Act of 1998, Pub. L. 105–276, Title V, 112 Stat. 2518–2670 (Oct. 21, 1998) ("QHWRA").

[18] The statute uses the term "owner," which is synonymous with the term "landlord," which term was used at trial.  Consistent with the parties, the Court uses the term "landlord."

[19] A lease may be for a term of less than one year "if the [PHA] determines that such shorter term would improve housing opportunities for the tenant and if such shorter term is considered to be a prevailing local market practice."  *Id.* § 1437f(o)(7)(A).

lease be one that is standard in the marketplace and "consistent with State and local law," *id.* § 1437f(o)(7)(B).  In addition, the contracts "may include any addenda required by the Secretary [of HUD] to set forth the provisions of" the HCV Program.  *Id.* § 1437f(o)(7)(F). Moreover, once the PHA enters into a contract with an owner, it must annually "inspect the unit before any assistance payment is made to determine whether the dwelling unit meets" housing quality standards set either by the Secretary of HUD, or "by local housing codes or by [PHAs] that . . . (I) meet or exceed housing quality standards . . . and (II) do not severely restrict housing choice."  *Id.* § 1437f(o)(8)(B) (housing quality standards), (D) (inspections must be annual).  HUD regulations further specify that the PHA must obtain HUD's approval to "apply standards in local housing codes or other codes adopted by the PHA." 24 C.F.R. § 382.401(a)(4)(ii).  Finally, the statute implies that HUD may authorize grounds upon which a PHA "may elect not to enter into a housing assistance payments contract."

As to the rent paid to a landlord, the 1937 Act requires that the rent paid pursuant to the Section 8 Program be reasonably comparable to "rents charged for comparable dwelling units in the private, unassisted local market."  42 U.S.C. § 1437f(o)(10)(A).  The PHA must assist the recipient, at her request, in negotiating the amount of rent for which the unit is leased:

> A [PHA] . . . shall, at the request of a family receiving tenant-based assistance under this subsection, assist that family in negotiating a reasonable rent with a dwelling unit owner.  A [PHA] . . . shall review the rent for a unit under consideration by the family (and all rent increases for units under lease by the family) to determine whether the rent (or rent increase) requested by the owner is reasonable.  If a [PHA] . . . determines that the rent (or rent increase) for a dwelling unit is not reasonable, the [PHA] . . . shall not make housing assistance payments to the owner under this subsection with respect to that unit.

36

*Id.* § 1437f(o)(10)(B).

As these statutes suggest, using funds received from HUD, HANH provides eligible families with vouchers to cover a portion of the cost of rent and utilities that such families incur by living in privately-owned housing.  In the statutory language, HUD "provide[s] assistance to public housing agencies for tenant-based assistance using a payment standard." *Id.* § 1437f(o)(1)(A).  Or as HUD explains, "[i]n the HUD Housing Choice Voucher Program . . . HUD pays rental subsidies so eligible families can afford decent, safe and sanitary housing.  Both programs are generally administered by State or local governmental entities called public housing agencies (PHAs)."  24 C.F.R. § 982.1(a)(1).  *See also Langlois v. Abington Hous. Auth.*, 207 F.3d 43, 45 (1st Cir. 2000) (the Section 8 Program "requires the PHA to pay the family's landlord the difference between the gross rent or a 'payment standard' adopted by the PHA, and a lesser amount paid by the family").

Each year, HUD establishes by publication in the *Federal Register* a "fair market rent[]," or "FMR," for thousands of geographic areas across the country, 42 U.S.C. § 1437f(c)(1), and these FMRs provide the baseline for calculating the payment standard for the voucher program's tenant-based assistance, which, unless the HUD Secretary otherwise provides, is to be between 90 and 110 percent of the FMR, *id.* § 1437f(o)(1)(B).  The statutory scheme contemplates that the payment standard will be flexible.  HUD may establish an "adjustment pool" of money from its budget allocation to use "to make adjusted payments to [PHAs] . . . to ensure continued affordability, if the Secretary determines that additional assistance for such purpose is necessary, based on documentation submitted by a [PHA]."  42 U.S.C. § 1437f(o)(1)(C).  HUD may also authorize a payment standard that

is more than 110 percent of the FMR—resulting in the so-called "exception rent." *Id.* § 1437f(o)(1)(D).

Once a payment standard has been determined for an area, a family that is deemed eligible to participate in the Section 8 Program[20] and whose application has been accepted by the PHA receives a voucher, during the term of which the family must find a unit to rent. Thereafter, the PHA provides the family financial assistance in the form of a "monthly assistance payment" calculated in one of two ways: (1) where the cost of rent plus tenant-paid utilities "does not exceed the applicable payment standard," the payment is calculated as the difference between that sum and the family's contribution;[21] or (2) where the cost of rent plus tenant-paid utilities "exceeds the applicable payment standard," the payment is calculated as the difference between the payment standard and the family's contribution. A family's contribution "may not exceed 40 percent of the monthly adjusted income of the family." *Id.* § 1437f(o)(2)(A)–(C).  HUD regulations explain that "[h]ousing assistance payments are paid to the owner."  24 C.F.R. § 982.311(a).  These payments are made under a housing assistance payment ("HAP") contract.

### 2.    Project-Based Assistance

In the project-based assistance scheme,

> [a] [PHA] may use amounts provided under an annual contributions contract under this subsection to enter into a housing assistance payment contract with respect to an existing, newly constructed, or rehabilitated structure, that is attached to the structure, subject to the limitations and requirements of this paragraph.

---

[20] Eligibility criteria are set forth at § 1437f(o)(4).

[21] The family's contribution is the greatest of "30 percent of the monthly adjusted income of the family," or "10 percent of the monthly income of the family," or the amount of welfare payments designated by the public welfare agency "to meet the housing costs of the family."  42 U.S.C. § 1437f(o)(2)(A).

42 U.S.C. § 1437f(o)(13)(A).

A PHA may enter into a project-based assistance contract—which "may have a term of up to 15 years," *id.* § 1437f(o)(13)(F)—if "the contract is consistent with" both the PHA's administrative plan and "the goal of deconcentrating poverty and expanding housing and economic opportunities." *Id.* § 1437f(o)(13)(C).  A PHA may apply up to "20 percent of the funding available [to it] for tenant-based assistance" to project-based assistance, *id.* § 1437f(o)(13)(B), and unless the contract is "for dwelling units that are" either "single family properties" or "specifically made available for households comprised of elderly families, disabled families, and families receiving supportive services," a maximum of one-quarter of the units in the structure receiving project-based assistance "may be assisted under a housing assistance payment contract for project-based assistance." *Id.* § 1437f(o)(13)(D). A PHA–owner contract for project-based assistance "shall establish rents for each unit assisted in an amount that does not exceed 110 percent of the applicable fair market rental (or any exception payment standard approved by the Secretary pursuant to paragraph (1)(D))," *id.* § 1437f(o)(13)(H), and reasonable rent adjustments are permitted, *id.* § 1437f(o)(13)(I).  The PHA has discretion to "establish preferences or criteria for selection for a unit assisted under this paragraph that are consistent with" its administrative plan.  *Id.* § 1437f(o)(13)(J).

> 3.    Moving to Work

In 1996 Congress created the Moving to Work ("MTW") demonstration program, the purpose of which is

> to give [PHAs] and [HUD] the flexibility to design and test various approaches for providing and administering housing assistance that: reduce cost and achieve greater cost effectiveness in Federal expenditures; give

> incentives to families with children where the head of household is working, seeking work, or is preparing for work by participating in job training, educational programs, or programs that assist people to obtain employment and become economically self-sufficient; and increase housing choices for low-income families.

Omnibus Consolidated Rescissions and Appropriations Act of 1996, Pub. L. 104–134, Title II, § 204, 110 Stat. 1321, 1321–281 to 282 (Apr. 26, 1996). The program is still in a demonstration phase, and has not been codified. *See id.* The PHAs selected by HUD to participate in the Moving to Work program (of which there may be up to 30) receive from HUD "training and technical assistance during the demonstration," and HUD must "conduct detailed evaluations of up to 15 such agencies in an effort to identify replicable program models promoting the purpose of the demonstration." *Id.* § 204(b). The benefit to a PHA participating in the Moving to Work program is that

> notwithstanding any provision of the United States Housing Act of 1937 except as provided in subsection (e), [the PHA] *may combine operating assistance* provided under section 9 of the United States Housing Act of 1937, *modernization assistance* provided under section 14 of such Act, and *assistance provided under section 8* of such Act for the certificate and voucher programs, *to provide housing assistance for low-income families*, as defined in section 3(b)(2) of the United States Housing Act of 1937, *and services to facilitate the transition to work* on such terms and conditions as the [PHA] may propose and the Secretary may approve.

*Id.* (emphases added). Thus, the idea of the MTW program is to grant PHAs additional flexibility in managing their funding and assets with the goals of both providing housing and facilitating participants' transition to employment. *Id.* A PHA's overall funding level "shall not be diminished by its participation" in the Moving to Work program. *Id.* at § 204(f). A PHA participating in the MTW program must administer its Section 8 Program in accordance with an agreement it executes with HUD.

40

4.     The Benefit of Section 8

Neither the 1937 Act nor implementing HUD regulations, nor the MTW legislation, state that as part of its administration of a Section 8 housing voucher program, a PHA must assist an eligible family in finding a unit; in fact they strongly suggest the contrary. The 1937 Act states only that "the term 'tenant-based assistance' means rental assistance . . . that provides for *the eligible family to select* suitable housing and to move to other suitable housing." 42 U.S.C. § 1437f(f)(7) (emphasis added). HUD explains that "[w]ith tenant-based assistance, the assisted unit is selected *by the family*," 24 C.F.R. § 982.1(b)(1) (emphasis added), and "[w]hen a family is selected [to participate in the program] or when a participant family wants to move to another unit, the PHA issues a voucher to the family. *The family may search* for a unit," *id.* § 982.302(a) (emphasis added); *see also id.* § 982.1(b)(2) ("To receive tenant-based assistance, the family selects a suitable unit."). When the family finds a suitable unit, it "must submit to the PHA a request for approval of the tenancy and a copy of the lease" pursuant to a PHA-set procedure. *Id.* § 982.302(c), (d); *see also Liberty Res.*, 528 F. Supp. 2d at 568, 569 (holding that §§ 982.1(b)(1) and 982.302 demonstrate that "the onus is on program participants to find their own rental units" and that "[t]he regulations generally put the onus of locating an available unit in the marketplace wholly on the voucher holder").

Similarly, HANH's Administrative Plans dated March 28, 2006 and May 27, 2008, which "establish[] local policies for administration of the program in accordance with HUD requirements" upon adoption by HANH's Board of Commissioners, and under which HANH must administer its Section 8 voucher program, *see* 24 C.F.R. § 982.54(a)–(c), explain that when HANH selects a family from the waiting list, or when a family wants to move,

41

"HANH issues a Housing Choice Voucher," which "is the family's authorization to search for housing" (March 2006 Admin. Plan, Jt. Ex. 2, at 5-13; May 2008 Admin. Plan, Jt. Ex. 16, at 56). The Plans state that the voucher's initial term is 60 calendar days, during which a family must find a suitable unit and submit a request for tenancy approval. HANH states that it may extend the period if "[i]t is necessary as a reasonable accommodation for a person with disabilities." (March 2006 Admin. Plan at 5-14; May 2008 Admin. Plan at 57.)

These sources make clear that the "individual services offered," *Choate*, 469 U.S. at 303, constituting the "benefit" of HANH's "program or activity," includes the provision of a voucher to a participant to find a unit; monthly assistance payments to a landlord to cover some portion of the cost of renting a private dwelling; and, upon request, assistance in a family's negotiation of a "reasonable rent." But this benefit does not include help finding housing, the provision of housing, or a guarantee that a participant will find suitable housing. As the *Liberty Resources* court concluded, "[n]either the [1937 Act] nor the HUD regulation promise to provide housing to all eligible participants. Rather, they state that the purpose of [the Section 8 Program] is to aid families in locating and affording decent housing through the provision of rental subsidies. The [Section 8] Program facilitates the placement of low-income families in affordable housing by seeking the assistance of private sector landlords." 528 F. Supp. 2d at 567. Congress's statement of purpose bolsters this conclusion. In 1998 Congress amended the 1937 Act to explain that

> It is the policy of the United States . . . that the Federal Government cannot through its direct action alone provide for the housing of every American citizen, or even a majority of its citizens, but it is the responsibility of the Government to promote and protect the *independent and collective actions of private citizens* to develop housing and strengthen their own neighborhoods.

42 U.S.C. § 1437(a)(2), *as amended by* QHWRA, Pub. L. 105–276, sec. 505, 112 Stat. 2461,

2523; *see also id.* § 1437(a)(4).  And as noted above, Congress has explained that the HCV

Program's purpose is to "aid[] low-income families in obtaining a decent place to live" by

having PHAs make "assistance payments . . . with respect to existing housing."  *Id.*

§ 1437f(a).

> C.      HANH Policies Regarding Disabled Participants

In a section entitled "Assistance to Voucher Holders," HANH's Administrative Plans

state that

> Families who require additional assistance during their search may call
> HANH Office to request assistance.  Voucher holders will be notified at their
> briefing session that HANH periodically updates the listing of available units
> and how the updated list may be obtained.

> HANH will assist families with negotiations with owners and provide other
> assistance related to the families' search for housing.

(March 2006 Admin. Plan at 5-16; May 2008 Admin. Plan at 59.)  These Administrative

Plans predate and postdate, and are not inconsistent with, a HUD investigative report of

HANH, dated September 26, 2006, that explained, with reference to Section 504 and 24

C.F.R. § 8.28, that HANH "is obligated to aid persons with disabilities in locating accessible

units in its Section 8 [P]rogram."  (HUD Sec. 504 Investigative Report # 1-06-R001-4, Jt. Ex.

3, at 9.)  Similarly, HANH Executive Director Karen DuBois–Walton testified that while a

participating family is using a housing choice voucher to search for an apartment, "[*i*]*f a*

*family requires assistance*, [HANH] will offer assistance in identifying [a] unit," and will also

extend the voucher's term "[i]f they're having a hard time finding a unit."  (Trial Tr. Vol. II

(8/18/09) at 348, 351 (emphasis added).)

These services provided by HANH do not change the Court's conclusions that the Section 8 Program's benefit consists of the voucher, housing assistance payments, and, upon request, lease negotiation; and that the program's benefit does not include search assistance, housing, or a guarantee of suitable housing. Indeed, as one court has explained them, "the regulations reflect an expectation by HUD that [Section 8] participants will select units that already meet individual needs and quality standards based on their existing state. . . . The regulations generally put the onus of locating an available unit in the marketplace wholly on the voucherholder." *Liberty Res.*, 528 F. Supp. 2d at 569. While HANH may help its Section 8 participants participate in the private housing market, the benefit—the very purpose—of the Section 8 Program is to provide recipients financial assistance necessary for them to participate in the private housing market.

V.   General Findings of Fact

HANH is a public housing authority created by the State of Connecticut and empowered by the City of New Haven to conduct its business within the jurisdiction of the New Haven–Meriden Metropolitan Statistical Area ("New Haven MSA").[22]   HANH administers both the low-income public housing ("LIPH") program and the Section 8 Program for the New Haven MSA. It now administers approximately 4,520 vouchers under the Section 8 Program (HANH Moving to Work Annual Plan for Fiscal Year 2008, Jt. Ex. 13,

---

[22] *See* Conn. Gen. Stat. §§ 8-40, 8-41; *see also* March 2006 Admin. Plan, Jt. Ex. 2, at 1-2 (stating jurisdiction as "City of New Haven"); May 2008 Admin. Plan, Jt. Ex. 16, at 242 (stating jurisdiction as the New Haven MSA and listing towns in it); *see also, e.g.*, HUD, Final Fair Market Rents for Fiscal Year 2010, 74 Fed. Reg. 50552, 50568 (Sept. 30, 2009) (listing this MSA and the towns in it, and assigning fair market rents to the area for Fiscal Year 2010).

at 29 (Draft Rev. Jan. 25, 2008)), and in July 2006 it administered approximately 4,345 vouchers (HUD Investigation Report Review No. 01-06-R001-4, Jt. Ex. 3, at 9).

In 2001, HUD selected HANH to participate in the MTW program, and while Jimmy Miller was executive director, HANH, with the help of the mayor of New Haven and other officials, negotiated and executed a renewed MTW agreement with HUD to begin in the 2007–08 fiscal year.  (Vol. I (8/17/09) at 161–65 (Miller).)  As a MTW PHA, HANH was freed from the obligation to comply with many of the regulations covering non-MTW Section 8 programs, but it was required to submit an annual plan to HUD for approval. Under Miller's direction, in 2008 HANH sought HUD's approval to amend its plan to permit HANH to provide housing assistance payments of up to 150 percent of the HUD-determined fair market rent without seeking approval from HUD, in part to permit it to provide higher payments to its disabled Section 8 participants as a reasonable accommodation without having to ask HUD for approval each time.  (HANH Draft 2008 MTW Plan, Jt. Ex. 13, at 10, 74; HUD Letter to Jimmy Miller dated Jan. 28, 2008, Pls.' Ex. 17 (approving HANH 2008 MTW Plan); *see also, e.g.*, Tr. Vol. I at 163 (Miller); Tr. Vol. II at 383–88 (DuBois–Walton); Tr. Vol. III (8/19/09) at 656 (Barber); Tr. Vol. IV (8/20/09) at 715–16 (Miller); Vol. VI (8/24/09) at 1134 (Barber); Tr. Vol. VII (9/8/09) at 1257, 1272, 1374–76 (Heinrichs).)  By way of explanation for why HANH did not earlier seek HUD's approval for the higher pre-approved payment amount, William Heinrichs, HANH's former Special Assistant to the Executive Director and Reasonable Accommodations Coordinator, testified that because the MTW program is in a demonstration stage, "being an MTW agency is akin to building an airplane while you fly it," and HANH was one of the first agencies to consider asking for this specific form of pre-approval.  (Tr. Vol. VII at 1387–88.)

45

Miller, who had previously been a deputy director at the PHAs in Newark and New York City, became HANH's executive director on December 5, 2005. He stayed in that position for over two and a half years, when on July 30, 2008 Karen DuBois–Walton replaced him as executive director. DuBois–Walton remains executive director today. (Tr. Vol. I at 42–43, 62–63 (Miller); Tr. Vol. II at 339–40 (DuBois–Walton).)

Maureen Novak began working for HANH in July 2001 as the Special Assistant to the Deputy Executive Director. On January 8, 2007, Miller named her Special Assistant to the Executive Director, in which position she worked until August 6, 2007, when she requested a leave of absence. Novak never returned to HANH. (Jt. Ex. 6.) Although Miller testified that at some point he recognized a "philosophical difference" between Novak and himself about "the scope of" HUD's regulations under Section 504 and "the amount of services and nature of services" that the regulations obligated HANH to provide—including mobility counseling—and that he, unlike she, believed that HANH "should be doing that on a proactive nature" (Tr. Vol. I at 103–04 [*sic*]), no supervisor ever reprimanded Novak or otherwise unfavorably reviewed her work (*see* Jt. Ex. 6).

While Novak was working at HANH, the agency's reasonable accommodation forms listed her as HANH's Reasonable Accommodations Coordinator. (*E.g.*, Defs.' Ex. 300.) In February 2007 Miller hired William Heinrichs—who had previously served as Representative Rosa DeLauro's congressional aide for housing, environment, homeland security, and veterans affairs—to serve as a Special Assistant to HANH's Executive Director. When Novak left HANH in August 2007, Heinrichs also took on the position of Reasonable Accommodations Coordinator. He served in both positions until May 12, 2008, when he left HANH. (Tr. Vol. VI (8/24/09) at 1178–82.) Thereafter, Laura Woodie, who had been

46

working at HANH in different capacities since February 2005, took over as Reasonable Accommodations Coordinator.  (Jt. Ex. 29 at ¶ 6.)[23]

Before Miller became executive director, HANH had contracted with Housing Opportunities Unlimited ("HOU") on June 9, 2004 to, *inter alia*, "[p]rovide individualized counseling and assistance to help referred families locate and lease up appropriate apartments in the private market," including meeting with families to assess their needs, identifying available apartments, transporting families to see available apartments, assisting families to apply for the apartments, and coordinating with HANH so that HANH staff could complete inspections, pay security deposits, and "arrange moving services and transfers of utilities."  (Jt. Ex. 1, Contract No. AD-04-C-007, at 1–2.)  The contract covered up to $100,000 worth of services to be completed by June 10, 2005, and permitted HANH, "at its option, [to] elect to renew th[e] contract for an additional consecutive 2-year period."

---

[23] Woodie began at HANH in February 2005 as a Quality Assurance Analyst.  In October 2006 she became the Acting Service Center Supervisor, and then in February 2007 the Service Center Supervisor.  In February 2008, Woodie became Acting LIPH Supervisor, a position she maintained until May 2008, when she became Acting Reasonable Accommodations Coordinator.  Woodie was named the Reasonable Accommodations Coordinator in December 2008, a position she held until May 2009 when she requested a leave of absence.  (*See* Jt. Ex. 29.)

(*Id.* at 1, 4.)[24]   Miller testified that when he became executive director in December 2005 the HANH–HOU contract had expired.  (Tr. 8/17/09 at 43–46.)

On July 20 and 21, 2006, HUD began an investigation of HANH to determine whether HANH's programs complied with "the general regulatory provisions of Section 504, program accessibility and employment policies," and on September 26, 2006 reported to HANH Board Chairman William DeMayo that HUD's "preliminary finding [was] that [HANH] is not in compliance with Section 504 regulations with respect to program accessibility requirements."  HUD "did not find evidence that [] HANH is fulfilling [its] obligations" under 24 C.F.R. § 8.28, a finding that HANH disputed.[25]   Nonetheless, a year later, on June 27, 2007, HANH entered into a Voluntary Compliance Agreement ("VCA")

---

[24] On July 29, 2004 HANH and HOU amended the contract so that HANH could provide HOU with office space (*id.* at 6), and on June 17, 2005, HANH renewed the contract "for another consecutive two years or until required residents have been successfully relocated from the Brookside Community" (*id.* at 7).  Brookside is a building operated by HANH as part of its LIPH portfolio.  The original Brookside building had stairs and was not accessible, and therefore the people living there—whom HOU needed to relocate under the June 2005 contract addendum—were not disabled.  (Tr. 8/20/09 at 818 (Woodie); *see also* HUD Investigation Report Review No. 01-06-R001-4, Jt. Ex. 3, at 7 (noting that Brookside was built in 1960 and that three of its 295 units (1 percent) were accessible in June 2006).)  HANH has planned to re-build Brookside and include in it accessible units.  Greg Brunson, one HOU employee who provided the relocation services, testified that Brookside's tenants were relocated in "[e]arly 2000" (Tr. Vol. V (8/21/09) at 1037 (Brunson)), but that does not accord with the 2005 contract addendum date.  In any event, at this point no one lives in Brookside, and construction on the new Brookside building was set to begin in October 2009 and be completed in February 2012.  (Defs.' Ex. 290; Tr. Vol. II at 410 (DuBois–Walton).)

[25] HUD Investigation Report Review No. 01-06-R001-4, Jt. Ex. 3, at 1, 4, 9; HANH Reply to HUD Section 504 Investigative Report, Jt. Ex. 4, at 2–3 ("HANH believes that we are compliant with the requirements of 24 CFR 8.28. . . . We are concerned that statements in the report may be understood as a representation that HUD has determined that HANH is not compliant with 24 CFR 8.28.").

with HUD, under which HANH "voluntarily" agreed to settle its differences with HUD regarding HUD's view of HANH's compliance with Section 504 and 24 C.F.R. § 8.28 without admitting "any violation of Section 504 . . . or any other Statute, Regulation or Executive Order." (VCA, Jt. Ex. 5, at 2.) The VCA primarily addressed HANH's obligations to construct or modify its own LIPH buildings to make them accessible, but also included some provisions regarding the Section 8 Program. HANH agreed to "compile a list of units that are accessible to persons with disabilities and otherwise eligible for participation in its housing choice voucher program so that persons with disabilities may participate in the program," including identification of what features in the unit are accessible—and to submit that list to HUD. (*Id.* at 7, 8.) HANH also agreed to improve its recordkeeping of its participants' requests for reasonable accommodations by "record[ing] each reasonable accommodation request, the date received, the action taken, and the date the action was taken," and to train its staff on how to comply with Section 504. (*Id.* at 8, 10.) Finally, the VCA stated that HANH's noncompliance "may serve as grounds for [HUD] imposing debarment" under 24 C.F.R. part 24 and 2 C.F.R. part 2424 (*id.* at 12), following the administrative-enforcement scheme described above in the discussion of a private right of action to enforce 24 C.F.R. § 8.28(a).

Privately-owned wheelchair-accessible apartments in New Haven are very scarce,[26] and disabled Section 8 Program participants have particular difficulty finding and leasing accessible apartments because private landlords exhibit both bias against the disabled (*see, e.g.*, Tr. of 5/7/08 Prelim. Inj. Hrg. at 35 (Taylor)) as well as "bias about people with Section

---

[26] Tr. Vol. V at 1102–03 (Salovitz); *see also* Tr. Vol. III at 488 (Gaither) (agreeing that "four-bedroom accessible units were very hard to come by in New Haven").

49

8" (Tr. Vol. I at 133–34 (Runlet)).  In August 2007 and under Miller's direction, HANH published a Request for Proposals ("RFP") to provide mobility counseling, including search assistance, for all of its Section 8 participants, including its disabled participants.  (RFP, Jt. Ex. 9, at 5, 20–24.)  Only one entity, Home, Inc., submitted a proposal, but negotiations between HANH and Home, Inc., broke down because Miller "wanted a performance-based contract that would have specific deliverables," while Home, Inc. wanted to use almost 65 percent of the $250,000 in funds to pay for its salaries.  (Tr. Vol. I at 59–61 (Miller).) Negotiations ended in early 2008, after which Miller re-published the RFP.  HANH has not contracted with an outside entity to provide mobility counseling under a contract reached pursuant to this RFP.  (*Id.* at 60–61.)

On April 25, 2007 Rhonda Gaither, a Section 8 participant whose 14-year-old son has cerebral palsy and uses a wheelchair, sued HANH to obtain assistance relocating her family to a wheelchair-accessible four-bedroom unit.  Just over three months later, on August 3, 2007 and with the approval of HANH's Board, Miller extended the expired HANH–HOU contract—under which $57,000 in services had not yet been rendered by HOU—so that an HOU employee could help Gaither find and move into an accessible unit.[27]

---

[27] On August 7, 2007, Miller wrote to HUD's Hartford field office to explain that he was "declaring an emergency so that I can engage the services of [HOU] to provide mobility counseling to the Gaither family," that he would do so by extending the expired HANH–HOU contract for three months, and that under the extension "HOU will provide these services for the Gaither family and other families having similar needs for accessible units."  (Jt. Ex. 7.)  To extend the contract Miller needed the approval of HANH's Board of Commissioners, to whom he submitted a recommendation and draft resolution.  On August 28, 2007 the Board of Commissioners met and discussed the language of the resolution.  (*See* Minutes of the Meeting, Jt. Ex. 10, at 20.)  Commissioner Robert Solomon suggested that the proposal "was totally unintelligible" and recommended clarifying the language by making "a grammatical change."  (Tr. Vol. III at 612–13 (Solomon); *see also* Jt. Ex. 10 at 21.)  On

That HOU employee, Greg Brunson, located at least one accessible unit (Tr. Vol. III at 477–78 (Gaither); *see also id.* at 488–89 (noting that absent her direction, Brunson was finding apartments in areas to which Gaither had no interest in moving)), but HANH did not permit Gaither to rent the apartment because it was above the payment standard HANH was authorized to provide to Gaither (Tr. Vol. V (8/21/09) at 1041–41 (Brunson)).

With assistance Gaither also located a local developer, Joseph O'Sullivan, who expressed a willingness to purchase a building and retrofit it to make the units wheelchair-accessible, and to lease one of these units to the Gaither family. He and HANH estimated that once the Gaither family's four-bedroom unit was constructed, its monthly rent would be $1,994, and the monthly cost of utilities would be an additional $328 to $394. (Tr. Vol.

---

August 28, 2007, the Board approved and Miller signed a resolution that permitted him to extend the contract expend "funds to assist the [Gaither] family . . . and . . . to provide such assistance to other families in the Section 8 Program who . . . have the need for accessible rental units." (Jt. Ex. 8 at 2.) Because the resolution passed pursuant to his emergency declaration, Miller felt uncomfortable extending services under the extension to more than two families:

> [T]he broad issue was hopefully being addressed by request for proposal, which is the appropriate way to handle the procurement. I would not have done this for 10, 15, 20, 30 families because in my opinion that would have been violation of the procurement requirements. . . . As a matter of scope, and one can disagree, but the issue was we had those two families that I knew of that needed immediate assistance. We thought we were going to cure the other issue with the RFP that was already there and have a broad RFP to cover everyone. Again, this was me saying this is an emergency. If I'm saying it's an emergency, then I'm saying it's of a limited scope and of limited duration; otherwise, it negates the issue of being emergency. So it's a matter of scope, it's not a matter of me making up it. . . . There is no magic about the three or four or five, it's just that I am rather conservative when it comes to procurement, and that's all it is.

(Tr. Vol. I at 115–16.)

III at 492–94, 518 (Gaither); *id.* at 639–40 (Barber); Tr. Vol. VI at 1155–56, 1165–72 (Barber); Tr. Vol. VII at 1265–66 (Heinrichs).)  Because the total monthly cost—between $2,322 to $2,388—exceeded by 59 to 64 percent the FMR approved by HUD for that fiscal year ($1,238), and also exceeded the maximum payment HANH was authorized to make to a Section 8 participant without HUD approval, HANH sought approval from HUD's field offices in Hartford and Boston to pay for this housing for Gaither.  The HUD field office in Boston denied the request, explaining that Section 8 payments may only be made to existing units, and that this request sought too high an increase over the fair market rent.  (*See generally* Jt. Ex. 7.)

Ultimately, Gaither herself found an accessible unit in Hamden, for which HANH would execute a HAP contract.  Gaither executed the lease on June 20, 2008.  (*See* Pls.' Ex. 6 at 66–76; Tr. Vol. III at 482 (Gaither agreeing that she found the apartment by herself).)  HANH had agreed to pay Brunson only if he found a unit into which Gaither actually moved; because Gaither did not move into a unit Brunson had located, Brunson was never paid for his work.  (Tr. Vol. V at 1039–40 (Brunson).)

VI.   Discussion

A.    Decertification of the Class

It is the Second Circuit's "longstanding view that the district court is often in the best position to assess the propriety of the class and has the ability . . . to alter or modify the class, create subclasses, and decertify the class whenever warranted," *In re Sumitomo Copper Litig.*, 262 F.3d 134, 139 (2d Cir. 2001), so long as it is "before final judgment," *see* Fed. R. Civ. P. 23(c)(1)(C).  Thus, "[i]f factual or legal underpinnings of the plaintiffs' successful class certification motion are undermined once they are tested [on the merits], a modification of

52

the order, or perhaps decertification, might then be appropriate." *In re Visa Check/MasterMoney Antitrust Litig.*, 192 F.R.D. 68, 89 (E.D.N.Y. 2000) ("*Visa Check*"), *aff'd*, 280 F.3d 124, 141 (2d Cir. 2001) (noting the existence of "a number of management tools available to a district court to address any individualized . . . issues that might arise in a class action, including" decertification), *abrogated on other grounds*, *In re IPO*, 471 F.3d at 39–40 (regarding scope of evidentiary inquiry district court must make when certifying class under Rule 23). Indeed, "courts are 'required to reassess their class rulings as the case develops,'" and "'[t]he district judge must define, redefine, subclass, and decertify as appropriate in response to the progression of the case from assertion to facts.'" *Boucher v. Syracuse Univ.*, 164 F.3d 113, 118 (2d Cir. 1999) (quoting *Barnes v. The Am. Tobacco Co.*, 161 F.3d 127, 140 (3d Cir. 1998) and quoting, in parenthetical, *Richardson v. Byrd*, 709 F.2d 1016, 1019 (5th Cir. 1983)).

The evidence at trial does not support the continued viability of a certified class. In particular, the Court based its conclusion that there was sufficient commonality and typicality on Plaintiffs' allegation "that [HANH's] policy, pattern and/or practice is triggered by their status as Disabled Section 8 Households, regardless of their particular disabilities, such that Defendants allegedly act on grounds generally applicable to all named plaintiffs and putative class members." *Taylor*, 257 F.R.D. at 32 (alteration in original). The evidence at trial does not support a conclusion that HANH took any discriminatory action or a programmatic approach to Disabled Section 8 Households *because of* their disability. Therefore, the class cannot remain certified. In addition, judgment must enter for Defendants on any part of Count Three—in which Plaintiffs claimed the existence of such

a policy—that survived the Court's conclusion that Plaintiffs do not have a private right of action to enforce 24 C.F.R. § 8.28(a).

### 1.    Findings of Fact

The evidence showed that HANH's Section 8 Program includes participants with a number of different disabilities in a number of different circumstances, who required myriad different accommodations. The evidence also does not support any conclusion that Defendants acted in a programmatic fashion.

In some cases, such as that of the Taylor family, the head of the household, who must accept an apartment, submit to HANH a request for tenancy approval, and sign a lease, is mobility impaired, and therefore to reasonably accommodate the household HANH may be required to transport the head of household as part of its mobility counseling. In other circumstances, such as those of the Gaither family, the head of household is not mobility-disabled, but another member of the household is. The services that an able-bodied head of household requires to find an accessible unit differs from the services that a disabled head of household needs. *Cf.* 24 C.F.R. § 8.28(a)(3) (applying not only when the voucher-holder is disabled, but also where "a family . . . includes an individual with [disabilities]"). Indeed, the evidence showed that while HANH contracted with HOU to provide Rhonda Gaither assistance in searching for accessible units, Gaither—who is able-bodied and whose son is confined to a wheelchair—was physically able to travel around to search for accessible units on her own, and in fact she herself found the unit in which she now lives.

In addition, some HANH Section 8 voucher-holders seek to move—and thus may require mobility counseling—while others do not. For example, Taylor sought HANH's services to help her family move to an accessible unit (*see* Tr. of 5/7/08 Prelim. Inj. Hrg.

54

[Doc. # 43] at 36), but voucher-holder Alberto Oko requested, as a reasonable accommodation, a utility allowance increase to account for rising electricity costs associated with his powered wheelchair (*see* Pls.' Ex. 41 at No. 71 at 2).  In at least one other case, the voucher-holder, Patricia Borelli, did not want to move out of her non-accessible home, but HANH demanded that she move anyway because she required one bedroom but had a voucher entitling her to three bedrooms.  (Pls.' Ex. 40 at P.B. at 1–9; Tr. Vol. IV at 952–55 (Woodie).)  And Salovitz reflects both circumstances.  In April 2008, he requested a reasonable accommodation to increase his utility allowance in the apartment in which he then resided.  (Pls.' Ex. 39 at 15.)  This was not a request for which HANH needed to provide Salovitz any mobility counseling.  (*See id.* at 20.)  In May 2009, by contrast, he wanted to move to another accessible unit, and in this circumstance sought HANH's assistance with searching for units with accessibility features.  (*Id.* at 21.)[28]

Moreover, different Disabled Section 8 Households had different needs, and HANH did not act programmatically in responding to different needs or requests of different Disabled Section 8 Households.

Many disabled voucher-holders sought, as a reasonable accommodation, an allowance in their vouchers for an extra bedroom to accommodate a live-in aide.  (*See, e.g.*, Pls.' Ex. 40 at 25 (Borelli's request for a live-in aide); Tr. Vol. V at 981 (Woodie) (stating that DuBois–Walton approved Borelli's request); *see also* Tr. Vol. VII at 1404–06 (Heinrichs) (estimating that one-third of all reasonable accommodation requests were for an extra bedroom for a live-in aide, and they were routinely approved); March 2006 Admin. Plan at 15-4 to 5 ("HANH will approve a live-in aide if needed as a reasonable accommodation so

---

[28] The facts pertaining to Salovitz's claim are discussed in greater detail *infra*.

that the program is readily accessible to and usable by persons with disabilities."); May 2008 Admin. Plan at 180 (same); *id.* at 51–53, 154; Spreadsheet of Reasonable Accommodation Requests as of Feb. 20, 2008, Pls.' Ex. 41f (cataloging bases of requests).)

Salovitz also reflects this circumstance, since in early 2006 he requested a voucher that permitted him a three-bedroom apartment that would provide sufficient space for a live-in aide, his equipment, and himself. (*See* Pls.' Ex. 39 at 2.) The evidence shows that these requests were generally granted after HANH received verification from the participant's physician of the participant's medical need for a live-in aide. This, for example, is how HANH handled Patricia Borelli's and Karl Hunter's requests for live-in aides. (Pls.' Ex. 40 (Borelli); Tr. Vol. IV at 940 (Woodie) (describing her verification of Hunter's medical need for a live-in aide).) And many disabled voucher-holders requested, as reasonable accommodations, that HANH extend the period of validity of their shopping vouchers so that they would have more time to find new apartments. The evidence showed that throughout the liability period, HANH routinely granted these requests for up to six months. (Tr. Vol. VIII (9/8/09) at 156 (Plaintiffs' counsel stating that "I have never contested HANH never provided extensions"); *see also* Tr. Vol. I at 257 (Miller); Tr. Vol. VI at 1156–57 (Barber); Tr. Vol. VIII at 19–20 (Santiago).)

The evidence also reflects no programmatic decision by HANH not to request exception rents as a reasonable accommodation for Disabled Section 8 Households, even before January 2008, when HANH obtained HUD's approval under the MTW program to make payments of up to 150 percent of FMR without seeking HUD's approval each time. In June 2007, when Andre Knox filed a reasonable accommodation request for a barrier-free unit that was wheelchair accessible, HANH had authority to authorize payments of only up

to 110 percent of FMR; to go above this amount HANH required approval from HUD.  After obtaining verification of Knox's need for accessible housing, Novak, on HANH's behalf, requested from HUD's Boston office permission to exceed the 110 percent threshold.  (*See* Defs.' Ex. 220 at 2.)  And the reply from HUD's Boston office to HANH's request for an exception rent to pay for O'Sullivan's proposed construction stated that the field office could only grant an exception up to 120 percent of the FMR, after which HANH would need to seek approval from the central office in Washington, DC.  (*See* Jt. Ex. 7 (citing 24 C.F.R. § 982.503(c)(2)(ii)).)

Finally, the evidence shows that HANH did not, on a programmatic or policy-wide basis, deny mobility counseling to those who requested it, even during the claimed liability period of January 2006 through April 2008.  Although Miller testified that he "d[id] not believe" that during the liability period HANH's Section 8 specialists performed a "mobility counseling function for disabled individuals who asked for help moving" within the meaning of the RFP (Tr. Vol. I at 52–53), during this period HANH received and Miller approved a June 2006 request from Lona Mitchell, who has arthritis, for "mobility counseling to assist [Mitchell's] family in finding an appropriate unit" on the first floor of a building or in a building with an elevator.  (*See* Defs.' Ex. 227.)  In late 2007 Louis Eugene Morrison requested a unit on the first floor of a building without stairs, as well as help filling out necessary forms.  Miller approved what HANH construed as Morrison's request for mobility counseling services to help him locate a first-floor apartment as well as assistance in completing the relevant forms.  (*See* Defs.' Ex. 228.)  Plaintiffs have proffered no evidence that HANH approved these requests but failed to provide the services promised.

In addition, each of the two subclasses are unsustainable. Because Plaintiffs do not have a private right of action to enforce 24 C.F.R. § 8.28(a)(3), the first subclass no longer has legal relevance, since the Court certified that subclass on the assumption—which, as the Court has now concluded, *supra*, was incorrect—that its members had privately enforceable legal entitlement to an AAUL under § 8.28(a)(3). Assuming HANH did not provide an appropriate AAUL, that failure is not actionable by these plaintiffs.

Instead, as explained above, the regulation suggests what kind of accommodation would be reasonable for HANH to make for Disabled Section 8 Households. But neither the FHAA nor Section 504 itself specify that PHAs must provide AAULs to these households. Therefore, Plaintiffs' action under Section 504 cannot proceed on the ground that they were injured by their inability to obtain the list. Instead, what the regulation reflects is that to make the Section 8 Program accessible to Disabled Section 8 Households, HANH must, when issuing vouchers to a family it has newly accepted into the Section 8 Program or to a family that wishes to move,[29] give those households any information about "available accessible units *known to* [*HANH*]." 24 C.F.R. § 8.28(a)(3) (emphasis added).[30] If subclass

---

[29] Under HUD regulations, a PHA issues a voucher—the act that triggers its obligation under 24 C.F.R. § 8.28(a)(3) to provide "a current listing of available accessible units known to the PHA"—only "[w]hen a family is selected" by the PHA to participate in the Section 8 Program, or "when a participant family wants to move to another unit." 24 C.F.R. § 982.302(a).

[30] The other legal authorities cited in the definition of this subclass are not to the contrary. The cited regulation simply repeats the broad prohibition embodied in Section 504 and the Fair Housing Act. *See* 24 C.F.R. 100.204(a) ("It shall be unlawful for any person to refuse to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford a handicapped person equal opportunity to use and enjoy a dwelling unit, including public and common use areas"). The statute, 42 U.S.C. § 3604(f), speaks broadly of discrimination "in the sale or rental" or "the terms,

(a) retains any viability, it must be based *not* on HANH's failure to provide an up-to-date listing of all accessible available privately-owned units in New Haven, but rather on HANH's failure to share with its Section 8 Disabled Households, when issuing them vouchers, information *in HANH's possession* about available accessible units.

Plaintiffs, however, did not adduce any evidence at trial that HANH had any information about available accessible units that it failed to share with Disabled Section 8 Households. To the contrary, much of the evidence focused on HANH's attempts to gather the very information necessary to compile an AAUL. Heinrichs designed a landlord survey and sent it out to approximately 1500 landlords in New Haven, but he left HANH just as the results were coming back in the Spring of 2008, so Tanya DeLoatch, a Program Clerk with HANH, completed the project in September 2008. (Tr. Vol. VII at 1261–63 (Heinrichs); Tr. Vol. II at 306, 316–17 (DeLoatch); Defs.' Ex. 266 (blank survey form used by Heinrichs and DeLoatch).) Woodie testified that she, too, sought information about accessible units from landlords in order to compile a list of available accessible units at the same time that DeLoatch was compiling her list. (Tr. Vol. IV at 849–50.) Moreover, Woodie testified that she put her name down on waiting lists for units in buildings that were accessible, and that when landlords called her for units in those buildings, she would place a disabled family in the accessible unit. (Tr. Vol. IV at 887.) This evidence shows that to the extent HANH had information about accessible units, it obtained that information for the very purpose of

---

conditions, or privileges of sale or rental of a dwelling" on the basis of disability, including "a refusal to make reasonable accommodations" when "necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(1), (2), (3)(B). These authorities are therefore no more specific than Section 504 itself. *Compare ibid.*, *with* 29 U.S.C. § 794(a).

sharing it with, and benefitting, its Disabled Section 8 Households. Therefore, subclass (a) cannot stand.

The second subclass cannot survive in its breadth. "To prevail on a reasonable accommodation claim, plaintiffs must first provide the governmental entity an opportunity to accommodate them through the entity's established procedures used to adjust the neutral policy in question[, because] [a] governmental entity must know what a plaintiff seeks prior to incurring liability for failing to affirmatively grant a reasonable accommodation." *Tsombanidis*, 352 F.3d at 578–79. As certified, the second subclass includes all Disabled Section 8 Households "that did not receive Mobility Counseling services, or offer thereof." *Taylor*, 257 F.R.D. at 33 (stating subclasses certified). But *Tsombanidis* teaches that a plaintiff does not have an actionable reasonable accommodation claim until she has requested, but failed to obtain, a specific accommodation. Therefore, subclass (b) cannot stand as-is. Plaintiffs have not shown any basis on which an entity may be liable for denying a specific reasonable accommodation to individuals who have not requested that specific accommodation because the entity has not offered that specific accommodation to its beneficiaries.

In addition, these fundamental problems with commonality and typicality also point to a third problem with the certified class: numerosity. Because at the class certification stage Plaintiffs argued that Defendants' allegedly unlawful conduct applied programmatically to all Disabled Section 8 Households, the relevant number in determining numerosity was the total number of Disabled Section 8 Households who receive Section 8 vouchers from HANH. Relying on Defendants' own statistics, the Court concluded that HANH served approximately 691 Disabled Section 8 Households. This number certainly reflected

sufficient numerosity to satisfy Federal Rule of Civil Procedure 23, since "[i]n the Second Circuit 'numerosity is presumed at a level of 40 members.'" *Taylor*, 257 F.R.D. at 29 (quoting *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995)).

But the discussion above shows that this calculation was based on an inaccurate premise, that is, that the same conduct by Defendants applied to all Disabled Section 8 Households. The facts in evidence simply do not support this contention. Instead, Plaintiffs have not shown the existence of any Disabled Section 8 Household to which HANH did not provide information known to it about available accessible units. It is also clear after presentation of the trial evidence that the relevant numerosity inquiry for subclass (b) is the number of Disabled Section 8 Households that *requested*, but did not receive, mobility counseling, and Plaintiffs have not adduced any evidence as to what this number is. To the contrary, the evidence showed that only a small number of disabled voucher-holders asked for mobility counseling. On cross-examination Miller testified that at the time he declared an emergency in order to extend HANH's contract with HOU to provide Rhonda Gaither with mobility counseling, he knew of five instances in which Disabled Section 8 Households requested but had not received mobility counseling. (Tr. Vol. I at 113–18 (Miller).) Similarly, Heinrichs testified that during his tenure as Reasonable Accommodations Coordinator, which lasted from August 2007 through May 2008, he encountered only "three or four" cases of reasonable accommodation requests, all of which were approved. (Tr. Vol. VII at 1405–06 (Heinrichs).)

### 2.   Conclusions of Law

In this case, the "factual [and] legal underpinnings of the plaintiffs' successful class certification motion [were] undermined once they [were] tested," *Visa Check*, 192 F.R.D. at

89, and decertification is now "appropriate," *id.*; *see also In re Sumitomo Copper Litig.*, 262 F.3d at 139, because it is clear that the certified class does not actually have three of "four familiar features," *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 222 (2d Cir. 2008), that a class must have to be certified: it does not meet the requirements of numerosity, commonality, or typicality, *see* Fed. R. Civ. P. 23(a).  Therefore, the March 10, 2009 Class Certification Order is now vacated.[31]

---

[31] On August 19, 2009 the Court discussed with the parties Plaintiffs' Motion for Sanctions [Doc. # 193] for Defendants' failure to timely provide in discovery e-mails to and from Maureen Novak between May and September 2007.  In their motion Plaintiffs argued that the failure to timely produce the evidence warranted sanctions because it was done with "a culpable state of mind."  *See Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002).  It is Plaintiffs' burden to establish the propriety of an adverse inference.  *Id.*

Plaintiffs argued that "Mr. Miller would like to shift blame on to Ms. Novak for much of what happened" (Tr. Vol. II at 292) and sought, as an adverse inference, that Defendants "be deemed to have intended to discriminate during the period covered by these emails" (Pls.' Mot. at 2).  The Court determined to take the motion under advisement until after "the end of all of the evidence because the materiality of this may evaporate or not."  (Tr. Vol. II at 293.)

The Court has now concluded that the is evidence shows that HANH did *not*, in fact, have a policy or practice of denying disabled participants' requests for reasonable accommodation on the basis of their disability.  Moreover, to the extent Novak, the Reasonable Accommodations Coordinator until August 2007, believed that HANH did not have the obligation to provide mobility counseling as a reasonable accommodation, she was overridden by her direct supervisor, Miller, who believed HANH did have such an obligation.  (Tr. Vol. I at 103 (Miller).)  In addition, Plaintiffs' counsel received a computer disk containing these e-mails in the week before trial and the Court permitted counsel to examine the emails after trial "to do some sort of random analysis of what you got" in that production in light of the Court's inability "to come to a conclusion as to the disposition [of the motion] without further knowledge" (Tr. Vol. II at 279, 293–94), but Plaintiffs have not shown that the e-mails were material.

Therefore, the Court concludes that the materiality of the missing e-mails has "evaporate[d]," that Plaintiffs have not met their burden, and thus that no sanctions are appropriate.  For these reasons, Plaintiffs' Motion for Sanctions will be denied.

B.      Claim of Rebecca Taylor

        1.      Findings of Fact

Plaintiff Rebecca Taylor passed away on March 23, 2009, during the pendency of this litigation, and she is represented in this action by her cousin, who lives in Florida.  (Pls.' Suggestion of Death [Doc. # 120]; Pls.' Am. Mot. to Substitute Rep. [Doc. # 197]; Order dated Aug. 26, 2009 [Doc. # 208] (granting amended motion to substitute).)  On May 7, 2008, Taylor testified during a preliminary injunction hearing in this case that she had spina bifida, that she was confined to a wheelchair, and that she "ha[d] a hard time getting around."  (Tr. of 5/7/08 Prelim. Inj. Hrg. [Doc. # 43] at 30–31.)  Taylor lived with her 25-year-old son and 15-year-old daughter (*id.* at 30), and there is no evidence that either her son or daughter are mobility-impaired.[32]

At that time, Taylor lived in an apartment at 205 Dover Street,[33] a building that was not wheelchair-accessible because there were three steps out front.  To get out of the house, she would "usually sit on the steps and pull [her] wheelchair down" after her.  (*Id.* at 30, 50.)  In early 2008 Bank of America initiated a foreclosure action against her landlord (3d Am. Compl. at ¶ 16; Defs.' Am. Answer [Doc. # 168] at ¶ 16), a fact of which Taylor became aware when she saw mail intended for her landlord but addressed to her (Tr. of 5/7/08 Prelim. Inj. Hrg. at 38).  Taylor had had a previous experience having her home foreclosed

---

[32] According to Taylor, her son has attention-deficit disorder.  (Tr. of Prelim. Inj. Hrg. at 37.)

[33] Taylor testified that for the most recent year she had lived on the first floor, and for the four years before that she lived on the second floor of a neighboring building, 207 Dover Street.  (Tr. of Prelim. Inj. Hrg. at 50.)

upon—in 2003 she was left homeless after a bank had foreclosed on her previous landlord—and wanted to avoid a similar experience. (*Id.* at 38–40.)

Taylor testified that during her recertification interview with her Section 8 Specialist, Denise Senior, she personally asked Senior for help searching for an accessible apartment, in response to which Senior said that it was Taylor's responsibility to find a new unit. (*Id.* at 41, 42.) According to Taylor, Senior did not discuss Taylor's right to request a reasonable accommodation (*id.* at 43–47), but Taylor acknowledged receiving notice of her right to seek a reasonable accommodation on July 7, 2006 and May 4, 2007 (Jt. Ex. 32; Defs.' Ex. 208).

It is unclear when Taylor first asked Senior for assistance. Taylor testified that the meeting took place earlier in 2008. However, HANH's file for Taylor, which contains documents dated as early as July 2006 and as late as July 2008,[34] contains no notes of any

---

[34] On September 30, 2009, Plaintiffs moved for an adverse inference against Miller and DuBois–Walton for what they characterized as Defendants' "fail[ure] to preserve unquestionably relevant documents," that is, HANH's files for Taylor covering the time span 2006 through April 22, 2008, which files Plaintiffs sought by subpoena dated September 3, 2009. (Pls.' Mot. Adverse Inference [Doc. # 227] at 1, 2.) Plaintiffs sought as sanctions an adverse inference that Miller and DuBois–Walton intended to discriminate against disabled Section 8 participants. (*Id.* at 2.) One week later, on October 7, 2009, Defendants produced HANH's file for Taylor as well as files of three other Section 8 participants. An exhibit to Plaintiffs' motion suggests that Defendants had produced this file to Plaintiffs before Plaintiffs moved for an adverse inference. (*See id.* at Ex. B (letter from Defendants' counsel that is identical, except for date, to the letter accompanying Defendants' production to the Court).) In all, these files total over 1,000 pages. (*See* Jt. Ex. 32 (Taylor); Jt. Ex. 33 (Ida Wilson); Pls.' Ex. 58 (Dorothy Stokes–Hall); Pls.' Ex. 59 (Rhonda Gaither).)

As described in the text, HANH's file for Taylor covers the time-span addressed by Plaintiffs' motion, including the time-span during which Taylor testified that she made a request for mobility counseling. (*See generally* Jt. Ex. 32.) The Court has examined this file—which totals approximately 500 pages—and has found no record of any request by Taylor for mobility counseling. In light of the Court's review of Defendants' October 7, 2009 production of Taylor's file, Plaintiffs' motion for an adverse inference is moot, and will be denied as such.

meeting between Senior and Taylor in early 2008 (*see generally* Jt. Ex. 32[35]), Taylor testified that she never saw Senior in person except at the recertification meetings (Tr. of 5/7/08 Prelim. Inj. Hrg. at 36–37), and Senior was on a medical leave of absence from HANH between March and September 2008 (Tr. Vol. VIII at 132).  HANH's file for Taylor also contains no indication that she requested mobility counseling or any other reasonable accommodation from Senior, the spreadsheet in which Heinrichs tracked reasonable accommodation requests through February 20, 2008 contains no entry for any request for mobility counseling or other reasonable accommodation by Taylor (*see* Pls.' Ex. 41f), and Heinrichs testified that he did not receive any such request from Taylor (Tr. Vol. VII at 1275–76) even though, according to Senior, any request for a reasonable accommodation would be routed to the Reasonable Accommodations Coordinator (Tr. Vol. VIII at 126, 130).

---

Pursuant to Federal Rule of Civil Procedure 11(c), Defendants seek sanctions against Plaintiffs for their having filed the Motion for an Adverse Inference.  (Defs.' Mot. Sanctions [Doc. # 232].)  Defendants argue that Plaintiffs' assertion that Joint Ex. 32 "did not state information as to whether or not Ms. Taylor had been recertified in May of 2007 or February of 2008" is incorrect, because "the truth of the matter is that Joint Exhibit 32 does establish that Ms. Taylor had her recertification done on May 4, 2007 at HANH."  (*Id.* at 1–2.)  As the Court's discussion reflects, Joint Exhibit 32 does not conclusively establish anything regarding when during the calendar year 2007 Taylor was recertified, and does not conclusively establish that the recertification was done on May 4, 2007.  Although Taylor did sign a number of forms on May 4, 2007 related to her recertification, her file also shows that HANH had, the previous year, sent her a number of forms to complete in anticipation of her recertification, and it also indicates that Senior performed Taylor's recertification on August 1, 2007.  Taylor's May 4, 2007 signatures therefore do not conclusively establish anything related to the timing of her 2007 recertification interview.  Defendants' motion will be denied.

[35] Defendants produced this exhibit without pagination, bates-stamping, or other indication of page order.  Therefore, the Court cannot cite precisely to the pages on which it relies.

Moreover, Taylor's file indicates that HANH conducted her annual recertification in August of each year—not in the first few months of the year.  Senior conducted Taylor's 2007 annual recertification on August 1, 2007, and consistent with a conclusion that Taylor's annual recertification was in August, Taylor submitted a number of forms and documents in July 2006 in anticipation for a recertification planned for August 2006.  (*See* Jt. Ex. 32.)[36]

The Court concludes that Taylor's first request was in late February or early March 2008 in light of Taylor's testimony that she was motivated to request assistance because of the potential foreclosure, which she learned about in early 2008: she testified that she asked Senior for assistance finding another apartment "[b]ecause the landlord is going to lose the apartment," which Taylor determined was the case because the mail made it "seem[] like he was being sued . . . because he[ was] not paying his mortgage" and "[was] being foreclosed on." (Tr. of 5/7/08 Prelim. Inj. Hrg. at 37–38.)  In late February or early March 2008, Taylor called Senior and left her a voicemail asking for mobility counseling, to which she did not receive any response.[37]  On March 14, 2008, Taylor wrote a letter to Senior asking Senior or

---

[36] Having been shown Taylor's May 4, 2007 acknowledgement of receipt of notification of her right to seek a reasonable accommodation, Woodie testified that Section 8 participants signed these forms during their annual recertifications, and therefore surmised that Taylor's annual recertification "would have been" in May. (Tr. Vol. IV at 875.) Even if the recertification was in May, Taylor filed her motion for a preliminary injunction in April, the month before the date of what would have been her 2008 recertification.

[37] Taylor's testimony is unclear and inconsistent as to when she first asked Senior for assistance finding a new apartment.  She testified that asked Senior in person at her most recent recertification, and that aside from her recertification meetings she never saw Senior. (Tr. of 5/7/08 Prelim. Inj. Hrg. at 36.)  She also testified that she could not remember when she last met with Senior, but she thought it was earlier in 2008.  (*E.g.*, *id.* at 36–37.)  Taylor's most recent recertification prior to the preliminary injunction hearing was on August 1, 2007.  (*See* Jt. Ex. 32.)  Taylor also testified that she asked for assistance moving because she was concerned about the foreclosure action against her landlord.  (Tr. of 5/7/08 Prelim. Inj.

HANH to help her find "an apartment with a ramp or no stairs" because of her disability.

Counsel for Taylor faxed this letter to HANH the same day. (March 14, 2008 Letter from

Taylor to Senior, Ex. C to Compl. [Doc. # 3]; Fax Verification Form, Ex. 17 to Pls.' Mot.

Prelim. Inj. [Doc. # 12].)[38]   In the meantime, Taylor conducted her search by examining

───────────────────

Hrg. at .) She did not learn about the foreclosure until the first few months of 2008.  Taylor also averred that "[d]uring my last recertification, [Senior] and I talked about my landlord's [foreclosure] problem" after she learned that her landlord was being sued in strict foreclosure. (*See* Taylor Aff. Dated April 10, 2008, Ex. 4 to Pls.' Mot. Prelim. Inj. [Doc. # 12] at ¶¶ 12–13.)

    Bank of America filed the foreclosure action against Taylor's landlord on February 14, 2008 in New Haven Superior Court.  (*See* Docket Report for Case No. NNH-CV-08-5017975-S, Ex. D to Compl. [Doc. # 3].)  At the preliminary injunction hearing, counsel for Taylor represented that "Taylor has requested a reasonable accommodation three times in three different ways: First, she requested it in person at the beginning of this year to her worker, [Senior], and that was a verbal request; second, she . . . attempted to request by telephone, [but] was not able to get [Senior] by telephone; third, she faxed [a] written request for accommodation [on March 14, 2008]."  (Tr. of 5/7/08 Prelim. Inj. Hrg. at 3.)  Both Taylor's March 14, 2008 letter and her April 10, 2008 affidavit suggest that the letter was a follow-up to a voicemail that Taylor had recently left for Senior, and therefore close in time.  (*See* March 14, 2008 Letter from Taylor to Senior, Ex. C to Compl.; Taylor Aff. at ¶ 15.)

    The Court concludes from this combination of Taylor's testimony and documentation that Taylor first requested mobility counseling from Senior by voicemail in late February or early March 2008, and thereafter attempted to fax a request to Senior on March 14, 2008.  In light of Taylor's difficulty dating her requests or recalling the details of her oral request to Senior, and the fact that there is no evidence that Taylor had any meeting with Senior after her August 1, 2007 recertification, which meeting predated the foreclosure action by more than six months, the Court cannot identify the date—a material fact—on which Taylor orally asked Senior for mobility counseling.  Absent this material fact, the Court cannot, in considering Taylor's claim, rely on Taylor's testimony that she orally requested mobility counseling from Senior.

    [38] Defendants claim that the number to which counsel faxed the letter was out of date and therefore neither Senior nor anyone else on HANH's Section 8 staff received Taylor's request.  (*See, e.g.*, Tr. Vol. VII at 1276 (Heinrichs).)  The number to which counsel faxed the letter is located on a reasonable accommodation form produced by HANH and used as

apartment listings provided by HANH and in the newspaper; the list she got from HANH did not list which apartments were accessible.  (Tr. of 5/7/08 Prelim. Inj. Hrg. at 32–35, 40, 50.)  She testified that she would call landlords, but they demurred because she was disabled and, she explained, they "don't want to be responsible if something happens . . . if they don't have the correct things for a handicapped person, like a ramp or whatever."[39]  Taylor testified that she would call landlords rather than visit units because it was difficult for her to leave her house and travel to see the units.  (*Id.* at 35.)

Taylor filed suit less than a month after faxing the letter, and on April 22, 2008 she moved for a preliminary injunction requiring HANH to provide her with mobility counseling and find her a new, accessible apartment.  (*See* Pls.' Mot. Prelim. Inj.)  The Court approved and adopted the parties' joint stipulated order for preliminary injunctive relief, Woodie provided Taylor mobility counseling and found her an accessible apartment in New Haven, Taylor signed a lease for a new apartment on July 22, 2008, and the lease term for the new apartment began on August 1, 2008.  (*See* Proposed Stip. [Doc. # 24]; Order dated May 27, 2008 [Doc. # 27]; Jt. Ex. 32.)  Plaintiffs agree that HANH provided Taylor with mobility counseling after she filed suit.  (*See, e.g.*, Tr. Vol. IV at 852–53; 3d Am. Compl. at ¶¶ 25–26.)

---

recently as January 2006.  That form indicated that Maureen Novak, Heinrichs's predecessor as HANH's former Reasonable Accommodations Coordinator, received faxes sent to that number.  (*See, e.g.*, Pls.' Ex. 39 at 2.)  Absent evidence that Defendants ceased using the number altogether, informed Taylor (or anyone) of the change in fax number, or took steps to retract the form listing the outdated number, the Court concludes that the fax was received somewhere within the HANH bureaucracy.

[39] If the landlords did discriminate against her on the basis of her disability, their actions may constitute violations of the FHA and FHAA.  However, those landlords are not named in this action, and Defendants may not be held liable for others' unlawful conduct.

2.    Conclusions of Law

Plaintiffs assert that Taylor was constructively denied a reasonable accommodation by HANH's failure to respond to her request for mobility counseling before she filed suit. Plaintiffs rely on three cases for the proposition that a delay can become a denial. *Groome Res. Ltd., L.L.C. v. Parish of Jefferson*, 234 F.3d 192, 199 (5th Cir. 2000); *Langlois*, 207 F.3d at 48; *Matyasovszky v. Hous. Auth. of the City of Bridgeport*, 226 F.R.D. 35, 45–46 (D. Conn. 2005). These cases do not support Plaintiffs' argument. In *Matyasovszky*, a court in this District certified a class of disabled persons eligible for low-income public housing in Bridgeport, members of which claimed that the housing authority's designation of certain housing units as only for elderly participants constituted discrimination on the basis of disability. 226 F.R.D. at 36–38. The case did not address the delay-as-denial issue at all. In *Langlois*, the First Circuit addressed a claim that PHAs unlawfully discriminated in favor of Section 8 applicants within their jurisdiction. Those outside the jurisdictions claimed that although their applications were not technically denied, as a practical matter the applications would rarely be granted since most openings would be given to in-jurisdiction applicants. 207 F.3d at 46–47. The First Circuit recited the PHAs' argument that the "residency preference does not permanently deny vouchers to any qualified person" but instead "merely delays them," and summarily rejected it, holding instead that "given the limits on funding, the delays apparently stretch into years, so delay may for practical purposes be the equivalent of denial." *Id.* at 48. Finally, in *Groome* the Fifth Circuit upheld a district court's determination that a zoning board's delay in acting on an application for a variance from zoning laws to be able to operate a group home for disabled patients constituted a denial. 234 F.3d at 196, 199. Before the plaintiffs filed suit in that case, their "full and complete

69

application had been submitted and reviewed," and had been pending for 95 days, notwithstanding the zoning board's target of responding to applications within 45 days, the "officials in charge of the application could not provide any timetable or plan for acting on the application," the fact that the plaintiff's ability to close on a house it had purchased was contingent on obtaining a variance, and the fact that the application had already been unofficial approved. *Id.* at 199 & n.7. The defendant did not challenge on appeal the district court's conclusion that its delay constituted a denial.

The Court does not intend to cast doubt on the proposition that delay may eventually become denial. *Cf. United Techs. Corp. v. Am. Home Assur. Co.*, 118 F. Supp. 2d 181, 188 (D. Conn. 2000) (suggesting that an insurer may engage in a "procedural[ly] unfair practice[]" by failing to respond to insurance claims within a reasonable time). However, the Court cannot conclude from the evidence in this case that HANH's delay in responding to Taylor's request for a reasonable accommodation constituted a denial. Unlike the defendants in *Langlois*, where the delay lasted "years," HANH's delay in this case was approximately two months, only one of which predated Taylor's filing suit. In addition to the fact that Taylor's application was pending for one-third less time than the plaintiff's application in *Groome*, HANH's reasonable accommodation staff had not received or reviewed Taylor's letter, let alone unofficially approved it and left her waiting for what was essentially a ministerial act.

In addition, there is no evidence that HANH delayed acting on Taylor's application in order to prevent her from moving, or with any motive to prevent a disabled Section 8 participant from obtaining housing. If, as the evidence suggests, HANH failed to respond to Taylor's request because of bureaucratic incompetence, that fact—unlike in *Groome*,

70

where the zoning board's delay "demonstrated an attempt to frustrate [the plaintiff's] purchase and operation of a group home," 234 F.3d at 199 n.7—does not show violations of Section 504 or the FHAA, which are "addressed to 'rules . . . that hurt [people with disabilities] *by reason of their handicap*, rather than that hurt them solely by virtue of what they have in common with other people.'" *Henrietta D.*, 331 F.3d at 276 (quoting *Good Shepherd Manor Found., Inc. v. City of Momence*, 323 F.3d 557, 561 (7th Cir. 2003) (emphasis in *Good Shepherd*)).

For these reasons, the Court concludes that Plaintiffs have not shown that HANH denied Taylor a reasonable accommodation by failing to respond to her request for mobility counseling or search assistance in the two months between when she first requested it and the date she moved for a preliminary injunction.  In addition, because HANH did not deny Taylor her request, Plaintiffs cannot show that Taylor was subjected to intentional discrimination on the basis of disability in violation of the FHA or FHAA.

C.     Claims of Karl Hunter

1.     Findings of Fact

Karl Hunter is a 52-year-old man confined to a wheelchair who has lived in Fellowship Place, on the corner of Dwight Street and Whalley Avenue in New Haven, since 2005.  (Hunter Aff., Defs.' Ex. 257, at ¶¶ 1–3; Tr. Vol. VIII at 66, 67, 81 (Hunter).)  Hunter resides there under a project-based voucher administered by HANH.  (*Id.* at 65–66; *see also* Tr. Vol. IV at 868 (Woodie).)  He does not like living there, since that area is dangerous, and he has been mugged.  (Tr. Vol. VIII at 67–68.)  In addition, his apartment has a kitchen area with a microwave and a sink, but no stove.  (*Id.* at 66.)  Hunter testified that there came a time when he sought help moving from Kristen Barber, a disability advocate with the City

of New Haven, who advised him to contact HANH.  He could not recall when that was.  In an affidavit dated August 4, 2008, he averred that until earlier that month, when Barber told him, he did not know that HANH could help him search for apartments (Hunter Aff. at ¶ 9), but he later testified that he did not learn until his June 2, 2009 deposition that he could obtain assistance moving—mobility counseling—from HANH (Tr. Vol. VIII at 74).  The documents in evidence show that Hunter received information about his right to request reasonable accommodations on June 13, 2007 and again on November 10, 2008.  (Defs.' Exs. 202, 206.)

The documents in evidence show that Hunter sought reasonable accommodations from HANH on December 8, 2008, at which time he requested, on a HANH reasonable accommodations form, a barrier-free apartment, accommodation for a live-in attendant, and mobility counseling.  (Pls.' Ex. 38 at 4.)  Hunter testified that he did not personally complete the form, but instead it was filled out by staff at Fellowship Place.  (Tr. Vol. VIII at 69–70.)  He stated that he did not want a live-in aide, but that the Fellowship Place staff wanted him to request one anyway.  (*Id.* at 96.)

Three weeks later, on December 29, 2008, Woodie sent Hunter a letter reciting his three reasonable accommodation requests, notifying him that HANH was "currently unable to process [his] application because it was incomplete," sending him his application, and asking him to "complete the highlighted sections."  (Pls.' Ex. 38 at 6; Defs.' Ex. 205.)  While Hunter thought Woodie's request was redundant since it sought information already within HANH's possession or knowledge such as his birth certificate and social security number (Tr. Vol. VIII at 71), Woodie testified that she pulled Hunter's HANH files to gather what information HANH already had about Hunter, and in her letter she asked Hunter for

72

information about his medical treatment so she could verify with Hunter's physician Hunter's medical need for a live-in aide (Tr. Vol. IV at 872–74), which was consistent with her approach to other requests requiring medical verification. When HANH received this information in calendar year 2009, Woodie sent a verification form to Hunter's physician. (*Id.*)

>    2.    Conclusions of Law

Even if an apartment without a stove does not comply with the housing quality standards set by HUD regulation,[40] that fact would not show any violation of Section 504 or the FHAA, since these statutes are "addressed to 'rules . . . that hurt [people with disabilities] *by reason of their handicap*, rather than that hurt them solely by virtue of what they have in common with other people.'" *Henrietta D.*, 331 F.3d at 276 (quoting *Good Shepherd*, 323 F.3d at 561).

Hunter's testimony regarding when he learned of his right to seek a reasonable accommodation was internally inconsistent, and it was also inconsistent with his signed acknowledgement that he received information about this right eighteen months before he first requested any reasonable accommodation. The evidence further shows that after receiving Hunter's request, Woodie promptly followed up with him—within three weeks—to confirm Hunter's need for a live-in aide, which need would affect the size of voucher to which Hunter would be entitled. Liability for failure to provide a reasonable accommodation cannot attach until the defendant has received and denied a request for

---

[40] *See* 24 C.F.R. § 982.401(c)(2)(i) ("[a] microwave may be substituted for an owner-supplied oven and stove or range *if* the tenant agrees and microwave ovens are furnished instead of an oven and stove or range to both subsidized *and* unsubsidized tenants in the building or premises" (emphases added)).

73

reasonable accommodation. *Tsombanidis*, 352 F.3d at 578–79.  Here, there is no evidence

that HANH has denied Hunter's request for a reasonable accommodation, and indeed the

evidence indicates that HANH has been working to approve Hunter's request and provide

the accommodations.  Therefore, Defendants cannot be liable to Hunter under the FHAA

or Section 504.

In addition, because Hunter has not shown that he "sought and was qualified for an

apartment," *Cabrera*, 24 F.3d at 381, or that he "was denied the opportunity to rent [an]

apartment," *id.*, he cannot make out an intentional-discrimination claim against HANH.

D.    Claim of Heiwa Salovitz

1.    Findings of Fact

Heiwa Salovitz, a man with cerebral palsy who is confined to a wheelchair, has been

a Section 8 participant since July 2001.  (Pls.' Ex. 39 at 2; Tr. Vol. V at 1045 (Salovitz).)

When he became a Section 8 participant, he attended an orientation run by HANH, but he

did not learn of his right to request an exception rent, search assistance, mobility counseling,

or utility allowances.  (*Id.* at 1047.)  He testified that he did not learn about these possible

accommodations at his recertifications, and learned about "these particular items"

"recently," when in 2007 he began serving on New Haven's Commission for Persons with

Disabilities.  (*Id.* at 1048–49.)  In 2003 Salovitz moved into the Residences at Ninth Square.

Although he did not learn the term "exception rent" until later (*id.* at 1088), the rent at this

building was above the FMR published annually by HUD, so to permit its Section 8 Program

participants to live there HANH had to approve exception rents (*e.g.*, Tr. Vol. IV at 885–86

(Woodie)).

74

Salovitz also testified, however, that he was informed annually, during his recertification, of his right to request a reasonable accommodation. (*Id.* at 1081, 1120.) In late 2005, Salovitz completed a request for a reasonable accommodation on a HANH form that listed a revision date of January 2004.[41]  In his 2005 request, Salovitz represented as follows:

> Currently I have a reasonable accommodation for 2 bedrooms.  Originally I had a reasonable accommodation because I have a live-in aide.  However, I have 2 powerchairs, a manual wheelchair, and a shower chair and there is not enough room for the live in aid[e] in my 2 bedroom unit.  I am therefore requesting a voucher for a three bedroom, so I will have room for both my equipment and the live in aide.

(Pls.' Ex. 39 at 1.)  Salovitz's physician confirmed on January 10, 2006 that Salovitz suffers from cerebral palsy and required a wheelchair, a permanent live-in aide, and a three-bedroom apartment to store his equipment. (*Id.* at 2.)  Salovitz testified that HANH granted the request. (Tr. Vol. V at 1078–79.)

Salovitz filed another reasonable accommodation request on April 30, 2008 for "a higher utility allowance" given his high electricity usage in charging batteries for his powered wheelchairs. (*Id.* at 15; *see also* Tr. Vol. V at 1082–86.)  Two months later, on July 1, 2008, Woodie e-mailed Salovitz to inform him that she needed additional information regarding his batteries. (*Cf.* Tr. Vol. IV at 962 (Woodie) (explaining, in the context of Oko's request, why specific verification of battery type and usage is required).)  Salovitz then filed a CHRO

---

[41]  The form provided the following "type[s] of accommodation" from which a requester could choose: "physical modification to a unit"; "barrier-free unit (wheelchair accessible)"; "unit adapted for sensory impairments"; "[a]ssignment of a reserved parking space"; "provision of the property lease or program regulations"; "[l]ive in [a]ide"; "[h]ousekeeping [s]tandard"; and "[*o*]*ther.*"  Salovitz determined that his request fell under the "[*o*]*ther*" category.  (*See* Pls.' Ex. 39 at 1 (emphasis in original).)

complaint against HANH on July 18, 2008, alleging that HANH's failure to act on his request constituted discrimination on the basis of disability.  (Pls.' Ex. 39 at 3–4 (Salovitz's CHRO complaint); *see also id.* at 5–9 (HANH's response to CHRO).)   Woodie and Salovitz scheduled a home visit on August 11, 2008, but Woodie did not appear.  (*Id.* at 18 (Salovitz letter).)  HANH's Reasonable Accommodations Committee met and considered Salovitz's request on September 4, 2008, and on September 8th, DuBois–Walton informed Salovitz by letter that HANH had "approved an increase of $80.00 a month" in his utility allowance, and also "offer[ed] [him] Mobility Counseling which will include assisting [him] in [his] search for a new housing unit."  (*Id.* at 20.)  According to Salovitz, DuBois–Walton's letter "was the end of this particular issue" as far as he was concerned.  (Tr. Vol. V at 1086.)

Salovitz had lived in the Residences at Ninth Square for six years, from May 2003 through May 2009, when there was a fire in his apartment and he was forced to relocate.  (*See id.* at 35–37; *see also* Tr. Vol. V at 1087, 1099–1100.)  He requested mobility counseling from HANH to assist him in his move.  Salovitz testified that the mobility counseling, which had been provided by Woodie and then Jennifer DeJesus, was "successful."  He needed to move immediately, and HANH paid for Salovitz to stay at a hotel while DeJesus searched for apartments for him.  HANH helped Salovitz travel around to, and view, different apartments during this search; with HANH's help Salovitz found a new apartment in three weeks.  (Tr. Vol. V at 1054, 1103–05.)[42]  With DeJesus's assistance, Salovitz visited the new unit he would eventually lease, and saw that it was a barrier-free, wheelchair-accessible unit that lacked grab-bars in the bathroom.  (*Id.* at 1106.)

---

[42] Salovitz's current address is sealed.  (Order dated Aug. 26, 2009 [Doc. # 207].)

On May 27, 2009, HANH approved a monthly housing assistance payment to Salovitz's landlord of $1210.  (Pls.' Ex. 39 at 30.)  According to both Salovitz's testimony and documents, the landlord promised both Salovitz and DeJesus to make the unit fully accessible.  DeJesus and Salovitz discussed with the landlord's agent Salovitz's need for grab-bars,[43] and the agent represented to them that the landlord would install grab-bars in the bathroom at no cost to him or to HANH.  (*See id.* at 1055–57, 1106–07; *see also* Pls.' Ex. 39 at 26–29 (e-mails among Salovitz, DeJesus, and the new unit's property manager).)  However, after Salovitz signed the lease and picked up his keys—and, presumably, after HANH executed a HAP contract with the landlord—Salovitz requested that the landlord install the grab-bars, but the landlord informed Salovitz that he would have to pay for the installation by a contractor of his choice.  (Tr. Vol. V at 1057–61; Pls.' Ex. 39 at 26–29, 31–34.)  The landlord repeated this position on August 10, 2009.  (Pls.' Ex. 39 at 38.)  A contractor estimated the installation cost at $1,046.60.  (*Id.* at 25.)

Salovitz turned to HANH for assistance.  According to Salovitz, DeJesus advocated on his behalf with the landlord, but the landlord refused to pay for the installation.  (Tr. Vol. V at 1062–63.)  On July 7, 2009 Salovitz e-mailed DeJesus to ask if HANH could approve an exception rent to pay for the grab-bars, but DeJesus replied two hours later that "HANH has no control over" any agreement between Salovitz and his new landlord, that she had "no luck" in her negotiation with his landlord, and that the issue "is something that is out of my hands."  (Pls.' Ex. 39 at 26.)

---

[43] Salovitz testified at trial about the substantial difficulties, disruptions, and distress he suffers daily as a result of not having grab-bars to make the bathroom safely accessible to him.  (*See, e.g.*, Tr. Vol. V at 1050–53, 1122–23.)

Miller testified, in connection with his handling of the Gaither matter, that HANH had a policy of not providing funds to modify privately-owned units. (*See* Tr. Vol. I at 77–78, 266–68 (concluding that such a policy would be a fundamental alteration to the program).) Rather than provide funds for individual modifications of privately-owned units attached to which were one-year HAP contracts that were not guaranteed to be renewed, Miller sought to use "other options," including "a loan program," to make capital-improvement loans to landlords, along the lines of a program he had operated while working at the New York City housing authority. (*Id.* at 268.) The record is silent on whether HANH ever implemented a loan program.

2.      Conclusions of Law

Salovitz's claim is that DeJesus's rejection of his request for an exception rent to pay for the grab-bars constitutes HANH's failure to provide a reasonable accommodation, in violation of Section 504 and the FHAA. He may also be claiming that this failure constitutes intentional discrimination under the FHAA. The facts show that Defendants have neither intentionally discriminated against him on the basis of his disability, nor failed to provide him a reasonable accommodation.[44]

---

[44] Salovitz and his counsel have considered whether, in refusing Salovitz's request to install the grab-bars, the landlord has violated Section 504 or the FHAA. In fact, Salovitz's counsel informed HANH on June 4, 2009 that "Salovitz plans to take legal action against [his landlord], but this is unlikely to produce any solution in the short term." (Defs.' Ex. 212 at 3.) Nonetheless, on August 21, 2009, Salovitz testified that he "would prefer not to" sue his landlord to force them to install the grab-bars, and instead "to solve this in an amicable way" with the landlord because he recently moved in to the unit. (Tr. Vol. V at 1065; *accord id.* at 1112–13.) In any event, even if the landlord's actions violated Section 504 or the FHAA, the landlord is not a party in this litigation, and the Defendants in this action cannot be held liable for others' unlawful conduct. If Plaintiffs were to contend otherwise, they would be "asking [HANH], the public entity responsible for [the Section 8 Program,] to resolve a

First, HANH's refusal does not constitute a failure to provide a reasonable accommodation.  As explained above, the "benefit" of Section 8 does not include housing, or a guarantee that a participant will find suitable housing.  While HANH administers the the LIPH program—in which it *does* provide housing directly to participants—Salovitz testified that he preferred participating in the Section 8 Program because that program "allows [him] to have choice and options within the community that [he] choose[s]."  (Tr. Vol. V at 1046–47).  Even if HANH had the power to control private landlords and force or coerce them to provide accessibility features promised but not provided, the "benefit" of the Section 8 Program does not include a guarantee of suitable housing, or any housing whatsoever, and does not include the funding of modifications to units by private landlords. "A plain reading of HUD regulations governing Section 8 programs shows that funding modifications to privately-owned units is not a service offered by [Section 8] Programs." *Liberty Res.*, 528 F. Supp. 2d at 569.

The benefit of the Section 8 Program for its participants is that the program provides them financial assistance to afford units available in the private market.  It is undisputed that HANH helped Salovitz find a unit that was available on the private market, and now provides him financial assistance to afford the monthly rent for that unit.  Therefore, Salovitz has not been denied access to the benefit of the Section 8 Program, and he cannot make out a claim under Section 504 or the reasonable-accommodation theory of the FHAA.

Second, Plaintiffs have not sustained their burden to show that Defendants intentionally discriminated against Salovitz on the basis of disability.  To the contrary,

difficulty experienced by disabled people that is the result of the actions of private individuals." *Liberty Res.*, 528 F. Supp. 2d at 569.

HANH approved Salovitz's previous two reasonable accommodation requests and provided him mobility counseling—by hosting Salovitz in a hotel, searching for accessible units for him, and helping him travel around with DeJesus to look at units—and contacted Salovitz's landlord to request that it provide grab-bars, as Salovitz and DeJesus had understood the landlord to have promised.  Moreover, the evidence suggests that HANH had already provided Salovitz with an exception rent to be able to afford to live in the unit.[45]  This "specific sequence of events leading up to the challenged decision," *Tsombanidis*, 352 F.3d at 579, of DeJesus's refusal to provide an exception rent to pay to install the grab-bars weighs against any conclusion that the refusal was based on DeJesus's discrimination against Salovitz on the basis of his disability.  Moreover, Plaintiffs adduced no evidence that HANH's "normal procedural sequences," *id.*, included the offer or approval of an exception rent to pay for modifications to privately-owned units for which a disabled Section 8 participant had a one-year lease, or that the "normal substantive criteria," *id.*, that HANH applied when determined whether to provide an exception rent (or a Section 8 voucher itself) involved modification of privately-owned units—or that HANH departed from these sequences and criteria in refusing Salovitz's request.[46]

--------

[45] In his request for a reasonable accommodation from his landlord, Salovitz represented that he lived alone.  (Pls.' Ex. 39 at 31.)  If Salovitz had a two-bedroom voucher (*cf. id.* at 1 (stating he had a two-bedroom voucher)), the HUD-determined fair market rent was $1101 per month.  *See* 73 Fed. Reg. 56638, 56649 (Sept. 29, 2008).  The HUD-determined fair market rent for a one-bedroom unit was $915 per month.  *Id.*  The $1210 per month approved by HANH represents 110 percent of the fair market rent for a two-bedroom unit, or 132 percent of the fair market rent for a one-bedroom unit.  The record does not contain any rent reasonable calculation for Salovitz's current unit.

[46] The evidence also does not show that Salovitz has made out a *prima facie* case under the FHA, since there is no evidence that he "was denied the opportunity to rent [an]

Miller testified that HANH had a blanket policy of not funding *any* modifications of privately-owned units, regardless of who asked for such funding.  (Tr. Vol. I at 77–78; Tr. Vol. IV at 719–20.)  Whether or not this policy is countenanced by Section 8, there is no evidence that HANH applied it in a discriminatory manner, and Plaintiffs may not rely on Section 504 or the FHAA to "challenge . . . the scope of a non-discriminatory program," *Am. Council of the Blind*, 525 F.3d at 1268.[47]

Moreover, in Count Four, Plaintiffs claim that to make the Section 8 Program's benefits equally accessible to participants with disabilities, HANH must fund modifications to privately-owned units.  Because the provision of any privately-owned housing, let alone suitable housing, is not a benefit of the Section 8 Program, it would be a fundamental alteration, not a reasonable accommodation, for HANH to fund modifications to units

_____

apartment," *Cabrera*, 24 F.3d at 381, at all, let alone that such denial was at the hands of HANH.

[47] Miller testified that rather than use HANH funds to modify individual privately-owned units, HANH used project-based vouchers to provide landlords with guaranteed income for a number of years—10 to 15 years—and in that manner "hopefully to encourage the owner to do the modification and development."  (Tr. Vol. I at 252.)  He explained that he determined not to use HANH funds to "mak[e] a modification to a tenant-based unit" because under the tenant-based program, HANH could not obtain "any long-term . . . commitment from the landlord," the Section 8 recipient could "leave[]" after one year, and therefore funding modifications was not "a fiscally prudent thing to do for a one-year lease unless [HANH] could find a way to recapture our investment."  (Tr. Vol. IV at 720–21.)  Even if private unit modifications could be construed to be within the benefit HANH offered in the Section 8 Program, "[s]ensibly construed, the fundamental-alteration component of the reasonable-modification" obligation does not require an accommodation if, "in the allocation of available resources, immediate relief" by funding such modifications "would be inequitable, given the responsibility [HANH] has undertaken" to assist "a large and diverse population of persons with . . . disabilities" to participate in the private housing market.  *See Olmstead*, 527 U.S. at 604 (plurality op.).

owned by entities other than HANH who are not obligated to provide housing for Section 8 Participants. The Rehabilitation Act and the FHAA's reasonable accommodation mandate require that programs be administered in a non-discriminatory manner, but do not support challenges to "the substance of the services provided to" the disabled, *Doe*, 148 F.3d at 84. Therefore, judgment must enter in favor of Defendants on Count Four.

E.    Summary

The evidence in this case leaves the Court with the firm conclusion that people with disabilities, and especially disabled recipients of Section 8 Program benefits, face severe hardships in finding apartments in New Haven that include the features necessary to make them accessible and safe. Taylor, for example, contacted private landlords who explicitly discriminated against her on the basis of her disability. Salovitz movingly described how the lack of grab-bars that would permit him to use the bathroom in a safe and efficient manner is deleterious and profoundly hinders his ability to go about everyday life activities. Hunter described how his disability left him subject to greater dangers on the streets outside his apartment. However, the evidence does not show that Defendants named in this litigation violated the rights that Section 504, the FHA, and the FHAA provide to Taylor, Hunter, or Salovitz. Therefore, judgment must enter in Defendants' favor on all of Plaintiffs' claims.[48]

_____

[48] After trial Defendants Jimmy Miller, Karen DuBois–Walton, and Robert Solomon moved for a judgment that they are not liable for punitive damages. (Defs.' Mot. J. [Doc. # 212].) Because the Court has concluded that Plaintiffs have not proved Defendants' liability under the FHA, FHAA, or Section 504, Defendants' motion is therefore moot, and will be denied as such.

Plaintiffs' Motion to Compel an Unredacted Tax Return from Jimmy Miller (Pls.' Mot. [Doc. # 236]) is similarly directed to discovery relevant to punitive damages against Miller. The Court earlier ruled that Plaintiffs were entitled to attorney fees for their previous motion to compel Miller to disclose his tax returns. (*See* Order dated Aug. 26, 2009

VII.    Conclusion

For the reasons stated above, the Court concludes that, in administering the Section 8 Program and providing the benefits of that program to Rebecca Taylor, Karl Hunter, and Heiwa Salovitz, Defendants did not violate the Fair Housing Act, the Fair Housing Act Amendments, or Section 504 of the Rehabilitation Act.

In addition, for the reasons stated above, the Court's Order Certifying a Class in this case [Doc. # 108] is VACATED; Plaintiffs' Emergency Motion for Sanctions [Doc. # 193] is

---

[Doc. # 208].)  Plaintiffs seek attorney fees in the amount of $5,525, representing 22.1 hours at $250 per hour, for their attorney's pursuit of this discovery (Pls.' Mot. Atty Fees [Doc. # 230]), as to which the Court found that Miller was "out of compliance" for failing to produce his tax return (Tr. Vol. II at 278).  Although Miller belatedly complied on October 5, 2009 (*see* Pls.' Notice of Filing Under Seal [Doc. # 229]), his production contained none of the pertinent financial information that Plaintiffs' discovery sought.  Miller's production of a redacted tax return defeated the purpose of the discovery Plaintiffs sought, and he therefore remains out of compliance.  However, Plaintiffs' purpose for seeking the tax return is now moot.  Plaintiffs' motion to compel will therefore be denied as moot.

Defendants object to Plaintiffs' counsel's fee application for 22.1 hours of work in connection with her efforts to obtain Miller's compliance with his discovery obligations. They argue that Miller was not obligated to produce his tax return until this Court overruled his objections to Magistrate Judge Fitzsimmons's ruling granting the Plaintiffs' motion to compel.  (Defs.' Obj. [Doc. # 231].)  Since Miller's grounds for objecting to the discovery were meritless, his perpetuating his objection provides no grounds to reduce the attorney-fee award; rather, it substantiates the amount of time Plaintiffs' counsel required to pursue the issue.  Notwithstanding Miller's unjustified opposition to the request for production, determined to be proper by both Magistrate Judge Fitzsimmons and this Court, the discovery issue is simple, and some reduction of compensable time is warranted (for example, for the 10.1 hours spent preparing and filing a sur-reply to Defendants' objections). However, after Plaintiffs filed the motion for attorney fees, additional time was required to prepare and file the motion to compel an unredacted tax return.  Although that motion to compel is moot, counsel is entitled to fees for her efforts to enforce Miller's discovery compliance.  To cover Attorney Vickery's subsequent motion to compel after Miller continued his resistance, the Court will award total fees of $5,000.00, representing 20 hours at $250 per hour.

DENIED; Defendants' Motion for Judgment Regarding Punitive Damages [Doc. # 212] is
DENIED; Plaintiffs' Motion for Sanctions [Doc. # 227] is DENIED; Plaintiffs' Motion for
Attorney Fees [Doc. # 230] is GRANTED IN PART, in the amount of $5,000.00; Defendants'
Motion for Sanctions [Doc. # 232] is DENIED; and Plaintiffs' Motion to Compel Production
of Unredacted Tax Return [Doc. # 236] is DENIED.

        Pursuant to Federal Rules of Civil Procedure 52 and 58, the Clerk is directed to enter
judgment for Defendants on all of Plaintiffs' claims, and to close this case.


                            IT IS SO ORDERED.


                            _____/s/_____
                            Janet Bond Arterton, U.S.D.J.


                    Dated at New Haven, Connecticut this 29th day of March, 2010.

84